## Case No. 1,475.

BLACKWELL et al. v. DIBRELL et al.

[3 Hughes, 151: 17 Am. Law Reg. (N. S.) 516; 14 O. G. 633; Cox, Am. Trade-Mark Cas. 337.] [1]

Circuit Court, E. D. Virginia. Jan. 13, 1878.

TRADEMARKS — "DURHAM" — FORFEITURE BY NON-USER—ASSIGNMENT TO COPARTNER — INCLUSION OF TRADEMARK BY IMPLICATION — EQUIVALENT TRADEMARK—ENJOINING ORIGINAL.

1. The right of exclusively using the word Durham in labels on smoking tobacco belongs to manufacturers of the article in the town of Durham, North Carolina. And

[Cited in A. F. Pike Manuf'g Co. v. Cleveland Stone Co., 35 Fed. 898.]

[See Alleghany Fertilizer Co. v. Woodside, Case No. 206, note.]

2. The right of exclusively using the word in connection with the picture of a Durham bull in labels on smoking tobacco belongs to W. T. Blackwell & Co., of that town.

3. The right to use a trademark is forfeited by non-user for a period of eight years, and cannot be resumed in prejudice of one who had used it exclusively during the period of abandonment.

4. The assignment by one partner of all his interest in a firm to his co-partner carries

[1] [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission. Cox, Am. Trade-Mark Cas. 337, contains only a partial report.]

with it, if not expressly reserved, the right to the exclusive use of a trademark of the firm.

5. A trademark consisting of a word and symbol arbitrarily assumed, may be lost by non-user by its owner, especially if the disuse continues as long as eight years.

6. If an equivalent trademark, without any knowledge of the first, be originated and devised by another person during such period of disuse, that other person may thereby acquire a right of exclusive use in the second trademark.

[See O'Rourke v. Central City Soap Co., 26 Fed. 578.]

7. If this second trademark during such period of abandonment acquires a public and valuable geographical and commercial signification, so that the use of the original trademark as an arbitrary one would operate to deceive and defraud the public, a court of equity may enjoin against such use of the original one.

[8. Cited in Burton v. Stratton, 12 Fed. 700, to the point that words to be upheld as a trademark must be merely arbitrary, or they must indicate the origin or ownership of the article or fabric to which they are affixed.]

[In chancery. Bill by W. T. Blackwell & Co. against W. E. Dibrell & Co. to enjoin the infringement of a trademark. Decree for perpetual injunction and for an accounting.]

Some time before the year 1860 the North Carolina Railroad was laid off over the farm of Dr. Bartlett, Durham, in Orange county, North Carolina. A station was established there, and called Durham Station. This spot shortly became the seat of a small tobacco factory, a blacksmith shop, a tavern, and the residence of two of three families. It remained an insignificant place until after the civil war, in 1865. It then began to grow up under the effects of a very prosperous tobacco business, which had risen there. In 1866 it was incorporated as a town and called Durham. Now it is a place of several thousand inhabitants, and of a very large business.

The original tobacco factory of 1860 was conducted by the firm of Morris & Wright. This firm principally manufactured plug tobacco, but it utilized its clippings and waste tobacco by putting it in bags and disposing of it as smoking tobacco.

Some time before, or in 1861, one of the partners of this firm, Wesley A. Wright (who is connected with the defence in this suit), sold out all his interest to the other partner, Morris, and went off into the neighborhood, where he manufactured tobacco in a rude way for a year, and then joined the Confederate army and disappeared from Durham Station. To that place he has not returned, either to reside or do business. He seemed to have paid a visit there about 1871 or 1872. We first hear of him after the war, as a tobacco manufacturer, in 1869, in Liberty, Virginia. He then went to Stewartsville, near Liberty. Hearing that J. R. Green, a successor to Morris & Wright, at Durham, was using the Durham bull as a trademark, he adopted the device of the head and neck of a short-horn bull on his tobacco. While at Lynchburg, in 1871, Wright sold to L. L. Armistead a patent which he had then recently obtained, No. 111,712, for a compound liquid flavoring—which he used in making an "improved smoking tobacco," called "Durham Smoking Tobacco," in which appellation he used the word Durham as an arbitrary term for the smoking tobacco made with the said patented flavoring liquid. Record, p. 211. All right to use the word thus derived by Armistead was sold by Armistead in September, 1872, to the firm of W. T. Blackwell, then consisting of W. T. Blackwell and Julian S. Carr, of Durham, N. C. Record, p. 207. It appears from the answer of defendants, Dibrell & Co., that they are and have been using, "with the consent and by the authority of the said Wesley A. Wright, a label substantially the same" as that used by the complainants, and filed by them as an exhibit, to wit: A label, having the words and device, "Established 1860 at Durham, N. C., the Original Durham Smoking Tobacco, W. A. Wright, originator and patentee."

The original factory of Morris & Wright, at Durham Station, went on under different proprietors, and its business has gradually developed into that now conducted by W. T. Blackwell & Co., the complainants in this suit. It is probably the largest manufactory of smoking tobacco in the world.

Those who profess to know, ascribe the prosperity which has attended this business to the peculiar excellence of the tobacco grown in several counties north of Durham, which market their product at that place. They say that it is through the influence of the climate or soil, or both, that the tobacco raised in the counties of Alamance, Orange, Caswell, Person, and Granville, in North Carolina, three-fourths of which is brought to Durham, has this quality. It is probable that there is more demand for the Durham tobacco as a smoking tobacco than for any other grown in the United States. It is regarded as superior to all other articles for making granulated tobacco on account of its bright color and fine natural flavor; its being chiefly flue, sun, or air cured, and thin in the leaf and sweet. Nineteen-twentieths of the tobacco manufactured at and sent from Durham are grown in the counties named. Durham is the principal market for the tobacco of these counties.

A circumstance which is claimed to have given this tobacco the most sudden and widespread celebrity was the following: Just at the close of the war the factory at Durham, which has been mentioned, had come down by assignment and succession to, and was then conducted by, one J. R. Green. At the time that Sherman's and Johnston's armies were in Orange county, Green happened to have a large quantity of loose leaf tobacco lying in bulk on the floor of his factory. Of course this was a prey which soldiers of either army as they passed along eagerly

seized upon, and the evidence is that the whole of this loose tobacco was thus carried away, and as the armies were soon disbanded much of it is conjectured to have been carried to distant parts of the Union. At all events the excellent quality of this smoking tobacco speedily obtained widespread advertisement and celebrity, and ever since then orders have come to Durham from every quarter of the United States.

J. R. Green found his business growing up rapidly under his hands. He at once adopted as his brand or label, and put it upon his bags, the words, "Durham Smoking Tobacco." He connected with these words the side figure of a short-horn bull, as a symbol of the word Durham; and he had a full-size painting of such a bull placed broadside upon his factory, in conspicuous view of the railroad, as an advertisement of his business to all travelers. Green having died, his business passed by succession and assignment to Blackwell and others, and is now conducted by W. T. Blackwell & Co., the complainants in this cause. The name Durham placed in Green's brand was, of course, suggested by the place where the species of tobacco in which he dealt was principally marketed, and was intended as descriptive of that tobacco. It indicated tobacco grown in what Wheeler calls the "Golden Belt of North Carolina." The trademark of a Durham bull was naturally assumed as a symbol of the word Durham, which had come to characterize the particular growth and quality of tobacco which is marketed and manufactured at Durham.

Those who claim under Wright disclaim that the word Durham, as used by him and them, has any reference to the place, Durham's Station, or Durham, in North Carolina, or to the tobacco marketed there by planters. They claim that Wright, when he manufactured tobacco near Durham's, a place then of utter insignificance, used the word Durham as an arbitrary term; that his tobacco was flavored with certain liquids invented and artificially concocted by him; that it was this flavoring, and not the soil or climate of the region trading to Durham, that gave his tobacco its excellence, and that the name Durham and the device of a Durham bull were suggested to him about the year 1860 by seeing the brand of Durham mustard on a tin box. Wright's testimony on this head is as follows: Was in business at Liberty, Va., in 1869; that was the first time the bull's head was used; first view was to adopt the entire bull in connection with the word Durham; the reason of not doing so was that his two sons in Kentucky wrote him that J. R. Green, of Durham, N. C., had adopted the bull on his brand, and he did not wish to interfere with anything that was ahead of him; first conceived the idea of using the word Durham and the bull in connection with it in 1860; and the reason why he did not carry it out until 1869 was his inability to do so for want of funds; the idea was first suggested by picking up a card (can?) of Durham mustard with the vignette of a bull on it.

Wright claims that Morris & Wright used the word Durham on their labels in 1860, and that he himself used the word in his label when living near Durham in 1861; but the evidence on this point is not at all conclusive.

On the other hand, the complainants deny that the word Durham was used at all before 1865 or 1866, either on the labels of Morris & Wright or of any of the successive firms which followed the original firm of Morris & Wright in the business at Durham's. If it was used, however, they claim the right to the exclusive use of it as successors and assignees of Morris, who bought out Wright's interest in the business of Morris & Wright. They insist, moreover, that Durham as descriptive of tobacco, is a geographical term, which first gained its significance just after the war, in 1865–66; that it derived its significance solely from the use of it by J. R. Green; and that, as Green's successors, they are entitled to the exclusive use of it. They patented a trademark in 1870 (No. 122), their patent describing their trademark as "painted on glazed paper, upon which is represented a side view of a Durham bull and the words 'Genuine Smoking Tobacco.'"

In 1871 a suit was brought in the superior court of North Carolina by W. T. Blackwell against W. A. Wright (Blackwell v. Wright, 73 N. C. 310), in which the complainant, claiming a right to the exclusive use of the word Durham as a descriptive term for his smoking tobacco, on the same label with his symbolic trademark of the side view of a short-horn bull, sought to enjoin the defendant Wright from using the word Durham as a description of his smoking tobacco upon a label similar in color, material, and general appearance, having on it the head and neck of a short-horn bull. The suit was a trademark suit, and the complaint contained no charge of fraud in deceiving the public, and no prayer for an injunction to prevent the use of a label deceptively assimilated to that of the complainant. The suit, after going to the supreme court of North Carolina, was dismissed on demurrer to the complaint, the demurrer being based on the ground that the complainant did not, by formal allegations of assignments, trace his title to the exclusive use of the trademark in question from J. R. Green.

In the same year a suit was brought in the United States circuit court for the western district of Virginia, at Lynchburg, by W. T. Blackwell and J. S. Carr, partners, trading under the firm name of W. T. Blackwell, against L. L. Armistead. See Blackwell v. Armistead [Case No. 1,474]. In that suit the complainants claimed the exclusive right to use the trademark already described, including the word Durham and the side view of a short-horn bull; charged an infringement of

it by Armistead, as assignee of William A. Wright, in the use of the label of Wright, also already described; and prayed an injunction against all further use of the last-named label. In this suit the complainants prevailed, and a perpetual injunction was granted; and the matters in controversy were afterwards compromised.

Upon this condition of facts, the complainants, W. T. Blackwell & Co., a firm now consisting of W. T. Blackwell, James R. Day, and Julian S. Carr, of Durham, N. C., have brought their bill into this court against W. E. Dibrell and W. W. Phillips, partners, doing business in Richmond, Va., under the firm name of W. E. Dibrell & Co. The complainants claim an exclusive right to use the trademark described in their patent (No. 122); they charge that the defendants are using the device and trademark which has been described as an imitation of their own and in infringement of their exclusive right; they allege that the defendants nowhere put their own name upon their labels, and that they disclose by such concealment an intention to defraud the complainants and the public generally; and they charge also that by the use of said label and trademark the defendants are practicing a fraud and deception by which the public are deluded, and induced to buy the said smoking tobacco as and for smoking tobacco made in Durham by the complainants. They charge also that the decree in the suit of Blackwell v. Armistead estops Wright and all others claiming under him from using the Wright label. The bill prays for an account and for a perpetual injunction.

The answer of defendants denies the right of complainants to the exclusive use of the word Durham in their label; denies that the Wright label is a fraudulent simulation of Blackwell's; founds their own title to use it upon the title of Wright, originating in 1860, and claimed to be still subsisting; and denies any intention to defraud the complainants or deceive the public. The answer also claims that Blackwell and W. T. Blackwell & Co. are estopped from claiming the exclusive use of the word Durham in their label by the decree of the supreme court of North Carolina in the case of Blackwell v. Wright.

Mr. Solicitor-General Samuel F. Phillips and W. A. Maury, of Washington; Mr. Legh R. Pace, of Richmond; Mr. John W. Daniel, of Lynchburg; and Messrs. Merriman, Fuller & Ashe, of North Carolina, appeared for the complainants.

Mr. W. D. Browne, of Washington; Mr. George Harding, of Philadelphia; and Messrs. Williams and Digges, of Lynchburg, and John O. Steger, of Richmond, appeared for the defendants.

HUGHES, District Judge. It is useless to review all the points relied upon by counsel on each side in their able arguments in the cause. I shall consider only those questions upon which, in my judgment, the case really turns.

I shall first deal with the objection of estoppel, or res judicata, urged by each party against the other.

In order for one suit to constitute an estoppel upon any party to another suit, four conditions must coexist, viz.: 1st. There must be an identity of the cause of action. 2d. There must be an identity of parties to the suit. 3d. There must be an identity in the character or quality of the respective parties; and 4th. There must be an identity of the thing in question. See Smith v. Turner [Case No. 13,119].

These conditions of identity do not exist between the present case and either of the cases of Blackwell v. Wright or Blackwell v. Armistead. Those cases, therefore, do not operate as estoppels. Nor do they at all affect the one now under consideration, except so far as they are precedents of authority upon the principles which were decided by them. In Blackwell v. Wright the decision was upon demurrer to the complaint; and, in technical effect, it was only that Blackwell had not traced his title to his trademark by proper allegations from Green; while, on the merits, the decision went only so far as to determine that the allegations of the complaint did not make a case of exclusive right to the trademark for the plaintiff. The complaint there did not charge that Wright's use of the trademark was a fraud upon the public, or pray for an injunction on that ground. None of these allegations can be made of the complainants' bill in this case.

In Blackwell v. Armistead it is true that the decision was upon the principal questions raised in the present case; but owing to the character of the pleadings it was based upon grounds narrower and more technical than those upon which I propose to found the present decision. That suit was a trademark case. This is more, and involves the question of the fraudulent use of a trademark, to the injury of the public at large, as well as of the complainants. Therefore, neither of the two cases which have been urged in estoppel governs even as precedents the present one, which I shall now proceed to consider.

Two questions arise as to the pleadings and evidence:

1st. The first is, whether the defendants have any right at all to use a label in which the word Durham is used as descriptive of smoking tobacco, and in which the figure of a short-horn bull is used as a symbol of the word Durham; their right to the exclusive use of it not being claimed.

2d. The second question is, whether the complainants have a right to the exclusive use of such a label.

In considering the first question, I shall, for the sake of brevity, speak of the defend-

ants' right to use the label described as Wright's, inasmuch as their title to use such a label could come, under the evidence in this cause, only from Wright.

Has, then, Wright, or his assignees, now, or have they at any time since 1865, had any right at all to use a label having in it the word Durham as descriptive of smoking tobacco, and having also in it the figure of a short-horn bull, or any part of that animal, as a symbol of the word Durham? Of course their title to use the word and the symbol stands on the same basis; if it falls as to the word it falls also as to the symbol of the word.

There can be no doubt of Green's original right to the exclusive use of the full figure of a short-horn bull as a trademark. That is virtually conceded by Wright himself in his testimony.

As to the word Durham as descriptive of smoking tobacco, the right to use it is in this cause claimed by defendants, who do business in Richmond, Va., and who advertise and sell, as Durham smoking tobacco, tobacco which they put up in Richmond, and which they obtain from any source available to them other than Durham.

Such a practice necessarily deceives every purchaser who, in purchasing this Durham smoking tobacco, believes that he is purchasing the fine tobacco put up in the place of that name in North Carolina. Dibrell & Co. claim solely from Wright. What then, is Wright's title under which this deception comes about?

He claims that he did not, in 1861, sell his right in the label used by Morris & Wright, to his partner Morris, when he sold all his interest in the business. He claims that he derived the word Durham and the device of a short-horn bull from a Durham mustard box. He pretends that neither the word nor the device, as invented and used by him, was descriptive or geographical in purport, but that they were arbitrary symbols, and that having been so at the beginning he and his assignees have still a right to use them.

The objection to this pretension lies not merely in the improbability of the origin of the use of the word Durham and its symbol which Wright recounts, or in the unsatisfactory character of the evidence on which his original right to use the word and its symbol is based, or in the presumption that when he sold in 1861 he sold all his interest to Morris; but it lies also in these two facts, viz.: 1st. That whatever title Wright had to the use of the word Durham after leaving Morris, in or about the year 1861, was lost by non-use, his disuse continuing through a period of eight or nine years after he left the vicinity of Durham's; and, 2d, That during this long period of disuse the brand of Durham smoking tobacco acquired a definite and peculiar meaning with dealers and consumers; the word Durham ceasing to be (even if it ever was) a mere arbitrary term,

and having obtained a geographical signification as to the place—Durham, and a commercial signification as to the article of tobacco manufactured at Durham. During the interval of disuse, the phrase Durham tobacco had come to indicate that portion of the product of a particular region of country which was marketed at the place called Durham's or Durham. The phrase "Durham Smoking Tobacco" had come to indicate in all markets, and among all dealers and consumers, the smoking tobacco marketed and manufactured at this place of Durham, in North Carolina.

It was not until after this signification had attached to the phrase that Wright adopted (or, as he pretends, returned to) the use of the word Durham, which he had abandoned. If, as he claims, the word Durham had in fact been used by him at first as an arbitrary trademark, and if, in addition, he had continued the use of it without interruption down to 1866 and on to the present time, that use by him would itself have prevented the other and local signification from attaching to the brand and word; for in that case, Durham smoking tobacco would have described two tobaccos: first, those marked and manufactured at Durham, and, second, those sprinkled with Wright's "Durham" juice.

But he did abandon its use; he stood by for some eight years and allowed a peculiar commercial and local signification to attach to the word Durham as descriptive of smoking tobacco, and not until after that local and commercial signification had come to identify the tobacco labelled with the word all over the country as coming from a particular region and as having a particular quality, and not until after this brand had come to be worth thousands of dollars to the manufacturers of this particular tobacco at this particular place, did he begin or resume the use of the device, which he claims to have derived from the mustard can. To put that word now on tobaccos grown elsewhere than at Durham, even though sprinkled with his "Durham" decoction, is, in the light of the evidence in this case, to pass them off as tobaccos coming from Durham, and is to deceive and defraud all who deal in and purchase the commodity as smoking tobacco from Durham. It has so come to pass from Wright's non-use for eight years, that to manufacture and sell other tobaccos at all and brand them with the word Durham is to deceive the public, no matter what liquid may be used on them. Under existing circumstances, to manufacture even Durham tobaccos elsewhere than at Durham, and to sprinkle them with a foreign liquid, is to deceive the public generally, and those who put up the genuine article at that place particularly. The manufacture of these tobaccos at that place is the best guarantee which the public and the trade can have that the commercial article labelled Durham Smoking Tobacco, and sold in all markets, is

genuine, and prepared under the fewest temptations to adulteration.

That the right to use a trademark may be lost by abandonment or disuse is too clear to need argument or the support of authority. The law of the subject is stated in the chapter on Abandonment, sections 674 to 691, of Browne on Trade-Marks.

It cannot be pretended that in Green's first use of his label, in 1865 or 1866, he had any intention of taking up an old label at second hand, or had any knowledge or belief that Wright, or any one else, could claim the label which he then devised as entirely novel and peculiar. The field was open to his enterprise and invention, for establishing his business and inventing his label and trademark just as he did.

Green's adoption in 1865 or '66 of the word Durham, as descriptive of the best tobacco of North Carolina put up by him, and of the bull as a symbol of the word, was naturally suggested by the facts of his business. If Wright had ever had such a label, which I do not feel that the evidence warrants us to believe, it was in 1865-66 unknown in Durham; had been abandoned even then for some four years; had never signified anything but tobacco sprinkled with Wright's decoction; and had never borne the valuable and creditable commercial signification which the climate and soil and good husbandry of North Carolina and the enterprise of a Durham manufacturer were about to give it.

By the several facts, of Wright's non-user of the label for eight years; of its never having, even as claimed by him, had any but an arbitrary significance as tobacco sprinkled with a species of artificial treacle; and of its having during a long period of disuse acquired a new, wholly different, and well and widely known geographical and commercial signification, Wright lost his right of using the label altogether. His use of it now operates necessarily to mislead and deceive the public as to the source of production and quality of the article bearing the label, thereby defrauding them; and the court will therefore make a decree of perpetual injunction against the further use of it.

As to the second question, whether Blackwell & Co. have an exclusive right to the use of the label described in the pleading, I think on the evidence submitted that they have. We have no hesitation in so deciding as against the defendant in this cause, and will incorporate in the decree of the court an order for an account of profits against the defendant as prayed for in the bill.

The label and trademark of complainants was established in 1865 by J. R. Green. His business and that of his successors built up the insignificant and obscure place, Durham's Station, into the flourishing town "Durham." The town grew up during the first four or five years of the use of the label, and owed its growth in chief part to the business indicated by the label. In that respect the case is similar to that of the trademark Cocoaine. Burnett v. Phalon, 3 Keyes [*42 N. Y.] 594. In respect to the commercial article bearing the geographical name, it is similar to that of the Akron cement. Newman v. Alvord, 51 N. Y. 189. The right of the complainants in this case has the double strength of that of the proprietors of the trademark Cocoaine, and of that of the Akron cement. The use of the principal characteristics of their trademark by manufacturers not conducting their business at Durham is a deception put upon the public, and may be enjoined on that ground alone, irrespectively of the trademark right. The use of the trademark invented by Green under which he and his successors built up his trade, and built up the town of Durham, like the use of the word Akron to the proprietors of the commercial article bearing that name, belongs exclusively to the successors of Green, and the court should secure its exclusive use to them.

I had some doubt whether in a litigation between Blackwell & Co., on the one hand, and defendants not doing business in the town of Durham on the other, it was competent for the court to decree that Blackwell & Co. have the exclusive right to the use of the word and symbol characterizing their trademark; but it is certainly competent for us to render a decree responsive to the issues made up by the allegations and denials of the bill and answer, one of which is this right of exclusive use claimed by Blackwell & Co. As between the complainants and defendants in this suit, therefore, we may so decree, even though other persons than the defendants to this record be not bound by the decree.

BOND, Circuit Judge, concurred in the decree, but is not responsible for every position taken in the opinion.

NOTE [from original report]. This trademark had been the subject of a previous suit in the circuit court of the western district of Virginia The * * * decision of Judge Rives on similar questions to those decided, as just reported by the circuit court of eastern district of Virginia, [will be found in Blackwell v. Armistead, Case No. 1,474.]

BLACKWELL (PATTON v.). See Case No. 10,831.

BLACKWELL (READING v.). See Case No. 11,612.

BLADEN (TREADWELL v.). See Case No. 14,154.

BLADEN (UNITED STATES v.). See Cases Nos. 14,605 and 14,606.

BLADEN (WATSON v.). See Case No. 17,277.

BLAG v. INSURANCE CO. See Cases Nos. 1,477, 1,478.