**BARTON et al. v. REX–OIL CO., Inc.**

(Circuit Court of Appeals, Third Circuit. October 21, 1924. Rehearing Denied December 1, 1924.)

No. 3079.

**1. Trade-marks and trade-names and unfair competition ⟶3(4), 67—Unfair competition in use of name.**

A descriptive name, though not capable of exclusive appropriation as a technical trade-mark, may by use and association with a commodity obtain a secondary significance, denoting that the goods bearing it come from one source, and thus a superior right to its use may be acquired by the person who first adopted it; but the utmost he can insist on is that no one shall use it against him in an unfair way.

**2. Trade-marks and trade-names and unfair competition ⟶93(1) — Unfair competition not presumed, but must be proved.**

A technical trade-mark being treated as property, infringement thereof carries with it the presumption of fraud; but where no exclusive right to the use of the mark exists, fraud, or unfair competition, in the use of the mark by another, must be proved, and not its use, but the unfair method of its use, is all that can be enjoined by the courts.

**3. Trade-marks and trade-names and unfair competition ⟶3(4)—"Dyanshine" held descriptive, and invalid as trade-mark for leather polish.**

The name "Dyanshine," as applied to a leather dressing, is a collection of several words, misspelled, which are merely descrip-

tive of the product, and is not subject-matter of a valid trade-mark.

**4. Trade-marks and trade-names and unfair competition ⚖=28—Time not essential to acquisition of secondary meaning of name.**

The test of secondary meaning of a word used as a trade-mark is whether it has become broadly known to the public as describing a product of certain origin, and the time of its use, while ordinarily a factor, is not necessarily controlling in such determination.

**5. Trade-marks and trade-names and unfair competition ⚖=71—Defendant held chargeable with unfair competition.**

After complainants had established an extensive trade throughout most of the states in a leather dressing sold under the trade-name "Dyanshine," defendant commenced the manufacture of a similar article, which it sold under the name "Dye and Shine," later changed to "Victory Dye and Shine." It employed a salesman of complainants, and sent him into territory with which he had become familiar while working for complainants to sell to dealers in complainants' product, who were told that the new product was just as good, was cheaper, and it was suggested that, because the names were alike in pronunciation, they could sell the new product to customers calling for "Dyanshine," which, as shown by evidence, was done. *Held,* that defendant was chargeable with unfair competition, which entitled complainants to an injunction.

**6. Trade-marks and trade-names and unfair competition ⚖=100 — Terms of injunction against unfair competition.**

Complainants having no exclusive trade-mark right in the name "Dyanshine," defendant has the legal right to use the name "Dye and Shine" for its own product, but in doing so must unmistakably distinguish it from that of complainants, and may fairly be required to use cartons and bottles with labels or printing which clearly make such distinction, by stating prominently that the preparation is not that of complainants, and further that it is not to be used or sold as such, or in filling orders for "Dyanshine."

Appeal from the District Court of the United States for the Western District of Pennsylvania; Robert M. Gibson, Judge.

Suit in equity by Warren D. Barton and others against the Rex-Oil Company, Inc. Decree for defendant, and complainants appeal. Reversed and remanded, with directions.

For opinion below, see 288 Fed. 878.

Edward S. Rogers and Allen M. Reed, both of Chicago, Ill., and Edward A. Lawrence, of Pittsburgh, Pa., for appellants.

Edgar T. Brandenburg and J. F. Brandenburg, both of Washington, D. C., and Edgar W. McCallister, of Pittsburgh, Pa. (E. W. Bradford, of Washington, D. C., of counsel), for appellee.

Before WOOLLEY and DAVIS, Circuit Judges, and RELLSTAB, District Judge.

WOOLLEY, Circuit Judge. Speaking of the parties as they stand on the record, this suit was brought by bill in equity filed by a firm trading as Barton Manufacturing Company against the Rex-Oil Company, a corporation, to restrain infringement of their registered trade-mark "Dyanshine," applied to shoe polish, by the use of the name "Dye and Shine" applied to similar goods, and for relief against unfair competition. From a decree dismissing the bill for want of equity, the complainants appealed.

These two questions are involved: First, whether the word "Dyanshine," a corruption of the words "dye and shine," describing the characteristics of a manufactured product, is the subject of a valid trade-mark registration under section 5 of the Federal Trade-Mark Act of February 20, 1905, as amended by Act Jan. 8, 1913, 37 Stat. 649 (Comp. St. § 9490); and, second, whether the word, though originally descriptive and therefore incapable of exclusive appropriation, had acquired a secondary meaning and thereafter had been unfairly used by the respondent in trade competition.

Before stating the facts we shall briefly review the law which we regard as applicable to these questions.

The Federal Trade-Mark Act authorizing the registration of trade-marks provides:

"That no mark which consists * * * merely in words or devices which are descriptive of the goods with which they are used, or of the character or quality of such goods * * * shall be registered under the terms of this act."

[1] This is the statutory law. The general law dealing not with registered trade-marks but with trade-marks which through use have acquired a secondary meaning, was reviewed by this court and applied in Apollo Bros. v. Perkins, 207 F. 530, 125 C. C. A. 192. Substituting the descriptive name here in question for the geographical name there in issue, this court held substantially as follows: It is essential that a trade-mark possess two characteristics: That either in meaning or association the mark point distinctively to the origin or ownership of the commercial article, and that it be of such a nature as to permit of an exclusive appropriation by one person. Nims on Unfair Business Competition, § 2. But a descriptive name, though not originally capable of exclusive appropriation, may, by use and association with a commodity, obtain a secondary signification denoting that goods bearing it come from one source, and thus a superior right to its use may be acquired by the person who first adopted it. Inasmuch as no absolute ownership in or exclusive right to use such name as a trade-mark

is vested in anyone, the rights obtained by the first user are not infringed by the mere use of such mark by a competitor, even though such use be in association with competing goods. If this were the whole law of the subject the matter would be easy. But just here arises another body of law, that of unfair competition. The law governing trade-marks is but a branch of the law regulating trade competition. The policy of this law is to foster, not to hamper, competition and it permits a monopoly in the use of a trade-mark only when it has become the absolute and exclusive property of the first user—good against the world. A merely descriptive name can never become such property, Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161; and the utmost the first user of such a name after it has acquired a secondary meaning can insist upon is that no one shall use it against him in an unfair way. Accordingly, the second user becomes an infringer only when he makes an unfair use of the mark. Not any competition, but only unfair competition on the part of such user is actionable. Canal Co. v. Clark, 13 Wall. (80 U. S.) 311, 324, 20 L. Ed. 581; Columbia Mills v. Alcorn, 150 U. S. 464, 14 S. Ct. 151, 37 L. Ed. 1144; Elgin Watch Co. v. Ill. Watch Co., 179 U. S. 665, 21 S. Ct. 270, 45 L. Ed. 365.

[2] A technical trade-mark being treated as property, infringement thereof carries with it the presumption of fraud; but where no exclusive right to the use of a trade-mark exists, fraud—unfair competition—in the use of the mark by another must be proved, Elgin Watch Co. v. Ill. Watch Co., supra; Siegert v. Gandolfi, 149 F. 100, 79 C. C. A. 142; and when proved, the utmost that the courts can do for the relief of the first user is to enjoin not the use of the trade-mark but the unfair method of its use. Thus it appears that while the first selection of a descriptive name which later has acquired a secondary meaning does not carry with it an exclusive right to its use, yet the first user has a right to be protected against one who subsequently so uses the name as to deceive the public and thereby take his trade from him; and in affording him this protection the later comer, when using the name, will be required to distinguish his goods and enlighten the trading public. American Waltham Watch Co. v. U. S. Watch Co., 173 Mass. 85, 53 N. E. 141, 43 L. R. A. 826, 73 Am. St. Rep. 263. In this way the courts preserve to the first user his superior right to the mark and, what is more important, guard the public. Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161; Computing Scale Co. v. Standard Computing Scale Co., 118 F. 965, 967, 55 C. C. A. 459; Photoplay Pub. Co. v. La Verne Pub. Co. (C. C. A.) 269 F. 730.

[3] Applying this law to the facts of the case, we think it will not be necessary to review in this opinion the extended argument on the question of the validity of the trade-mark registration but that in announcing our judgment it will be enough to say that the word "Dyanshine" is merely descriptive of the characteristics of the product, Ungles-Hoggette Mfg. Co. v. Farmers', etc., Co., 233 F. 116, 146 C. C. A. 308; and therefore this word, a collection of several words misspelled, Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 220 U. S. 446, 31 S. Ct. 456, 55 L. Ed. 536, is not a subject-matter of a valid trade-mark. We are in accord with the finding of the learned trial court that the registration is invalid.

The next question is that of unfair competition, its first aspect being whether on the facts the complainants' trade-name "Dyanshine" has acquired a secondary meaning wherein its descriptive quality has become merged in a newly acquired and therefore secondary quality which identifies the product in the mind of the public as that of the complainants' manufacture.

The facts disclose that the complainants' business is one of many commercial romances developed by the war. Warren D. Barton, a small dealer in leather goods at Waco, Texas, quite accidentally discovered in a chemical preparation the dual qualities of dyeing and shining leather. After a series of experiments, he conceived a formula (still held secret) for the manufacture of the preparation and, making a small quantity, he peddled it at Camp MacArthur nearby. He called it "Dyanshine," a misspelling of words descriptive of its qualities. It kept soldiers' puttees and trappings in excellent condition and immediately became popular. At first Barton's supply was limited to available bottles of varied sizes and colors purchased at local stores and junk shops. Almost immediately the demand outran the supply. This was due to several circumstances. There was a large number of troops at Camp MacArthur. Officers ordered their men to use the preparation and men and officers moving to camps in other parts of the country wrote back for more of it, until, later, the Government included it in orders for troop equipment.

The story of the beginning of this business is similar to that of the well-known Bull Durham smoking tobacco, told in Blackwell v. Dibrell, 3 Fed. Cas. 549; 3 Hughes, 151. There the popularity of the tobacco was due to Sherman's and Johnston's armies passing through the district in North Carolina where the tobacco was grown and preying upon the tobacco houses, and its notoriety was due to the soldiers, after disbandment of the armies, writing from all parts of the country for more of it.

Barton formed a partnership with sufficient capital to handle this suddenly grown up business. A brief chronicle of its expansion discloses that there was no record of sales in 1918 and the early part of 1919, but beginning in 1919, the firm sold 1,198,600 bottles; in 1920, 3,371,320 bottles; in 1921, 3,964,784 bottles and in 1922 (to October 1) 3,485,000 bottles. The largest sales were in the south but the business extended as far east as Boston, as far north as Pittsburgh and Chicago, as far west as Omaha, and the product, under the trade-name of "Dyanshine," later registered as a trademark, is now handled through 2,374 jobbers supplying 186,722 retail dealers and serving a trade which, of course, is larger than the number of bottles sold.

[4] Thus within two or three years and by its trade-name there arose a market for the product which under other circumstances might never have been attained and, doubtless, would not have been attained except through long and expensive advertising. If, under the circumstances narrated, the plaintiffs' trade-mark acquired a secondary meaning, it was done very quickly; and if a secondary meaning is to be measured only by the time within which it was acquired, this trade-mark has no such meaning. The respondent urges that secondary meaning is to be determined by the time taken in acquiring it. This is a rule of experience rather than a rule of law for in most of the cases reported, and in all cited by the respondent, the time in acquiring a secondary meaning figured largely and in some cases exclusively in determining whether such meaning had been acquired. Time is the usual standard because a natural one but it is not the exclusive standard. The test of secondary meaning is whether the trademark has become broadly known to the public as denoting a product of certain origin. Therefore, in looking for a secondary meaning this court is controlled by the *fact* that such a meaning has been acquired in the mind of the public rather than by the time it

has taken for that fact to become established. The time in this case was unusually short, due to unusual circumstances; yet it is perfectly plain that by circumstances rather than by time the complainants' trademark had acquired a secondary meaning within the full sense of that term.

[5] The second aspect of the question of unfair competition is whether the respondent in appropriating (and spelling correctly) the catchwords of the complainants' trade-mark after it had acquired a secondary meaning, and in reaping the benefit to be derived from it, engaged in competition containing the elements of fraud. What the respondent did was this:

The Rex-Oil Company had for many years been engaged in the business of manufacturing and selling shoe polishes with headquarters at Pittsburgh, Pennsylvania. In 1920, learning for the first time that such a commodity as that of the complainants bearing such a trade-mark was on the market, it employed one of the complainants' salesmen when on his employers' business in Pittsburgh, and set about making a preparation of its own with the same dual qualities, which, it said, had long been in contemplation. It immediately put the product on the market under the trade-name of "Dye and Shine" and sent the salesman back to the territory where he was acquainted with the complainants' customers. It did not even wait for appropriately worded cartons in which to pack the product but sent it out in old cartons with stickers covering an old trade-name of another preparation and bearing the new trade-name of "Dye and Shine." (Later, it added the word "Victory" to the lettering of the cartons and use the prefix "Rex-Oil.") Before doing this, however, it consulted a trade-mark attorney and was advised that the complainants' registration was invalid and that the critical descriptive words were free to any producer.

The respondent company pushed its wares vigorously and in many places succeeded in displacing the wares of the complainants, mainly because it sold its product at a price permitting re-sale at twenty-five cents a bottle while the retail price of the complainants' product is fifty cents a bottle. Standing alone, there was nothing wrong in this. Nor did the respondent pass off its product for that of the complainants by representing that it was the complainants' product. Its conduct was not so crude. It sent its salesmen to dealers handling the complainants' goods, who told them that the Rex-Oil

product is just as good as Barton's, which may be true, and demonstrated to them that it is cheaper, which is true. Again, there was nothing wrong in this. But in their conversations there was the plain intimation that when customers asked for "Dyanshine" (the complainants' corrupted word and the respondent's three words, *as pronounced,* being indistinguishable) they could sell them "Dye and Shine." In some instances where no comparison of goods was made a few dealers were deceived; not many, to be sure, but a few. The deception, however, did not rest here because as stated in National Biscuit Co. v. Baker, 95 Fed. 135, "it makes no difference that dealers in the article are not deceived." They are informed and usually know what they are buying. The law concerns itself with the casual purchaser who knows the commodity only by its name. In obtaining what he asks for he is entitled to protection against unfair dealing, whether there be a technical trademark or not. Lilly & Co. v. Warner & Co. (C. C. A.) 275 F. 752; Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161. So, in this case, the public knew the name "Dyanshine" and what the article bearing that name would do on their shoes. Until the respondent entered the field there was only one product of that kind and only one having that name and that was the complainants' product. What happened was exactly what was expected, namely, when a customer went into a shop and asked for a bottle of "Dyanshine"—pronouncing the word as it sounds, not spelling it—would the dealer ask him which make he wanted—whether Barton's or Rex-Oil? Not at all. He asked him whether he wanted a fifty cent bottle or a twenty-five cent bottle. Not knowing that the difference in price reflected a difference in products, the customer would do the natural thing and ask for a bottle at the lower price. Of this there is abundant evidence. The effect in deceiving the public and in taking the complainants' trade was just as certain as though the deception had been more direct.

In appropriating the substance of the complainants' trade-mark and also the substance of the catchwords and phrases of their trade advertisements, the respondent accomplished quite successfully what it had set out to do, namely, the deception of the public and the capture of a portion of the complainants' trade. There is no question that the respondent has a right to compete with the complainants in the same line of business and win as much of their trade as it can; but the right which the law gives everyone freely and stiffly to compete for trade means only the right to compete fairly. It does not bestow upon anyone an unbridled license to do just what he may choose in utter disregard of the legal rights of competitors and the purchasing public. We are of opinion that the respondent's practices amounted to unfair competition within the sense of that term.

[6] The charge of unfair competition having been established it follows that, besides allowing the complainants damages for the injury they have sustained, equity will afford them relief by injunction to prevent such unfair competition in the future. Acts of unfair competition having been shown, we are warranted in concluding that the respondent is disposed to continue the same course of conduct, unless restrained. Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161. As the learned District Court, upon which will devolve the task of framing the injunction, is entitled to an expression of our views in so far as they have developed from the record, we shall consider the character and extent of this relief.

The complainants, being entitled to relief, are entitled to effective relief; and any doubt in respect to the extent thereof must be resolved in their favor as the innocent producers and against the respondent, the offending producer. Clearly, the relief should extend far enough to enjoin the respondent, and its agents, from, directly or indirectly, representing or suggesting or insinuating to customers the feasibility or possibility of passing off "Dye and Shine" for "Dyanshine." It is just here that we find it difficult to write this principle in practical terms and this is because the two expressions when spoken are identical in sound and therefore indistinguishable. When a person hears of an article he is not apt to inquire as to its spelling; it is more than likely fixed in his memory as a sound which he repeats orally when he makes a purchase. In suggesting a solution of this perplexing matter we shall assume that, under the law, the respondent has a right to use the words dye and shine either as a name for or as descriptive of its product provided that such use, in either case, be absolutely fair. In looking for what is a fair use we first regard the question negatively and hold that the mere addition of the word "Victory" and of the prefix "Rex-Oil" to the troublesome words does not meet the requirement. Faul-

der & Co. v. O. & G. Rushton, 20 Reports of Patent Cases, 477, 489.

If the respondent should select a new name for its product, it may freely use the words dye and shine in describing its qualities if it does so in terms that are purely descriptive. If, with all the words of the English language at its disposal, it should adhere to the words "Dye and Shine" as the *name* of its product, it must unmistakably distinguish the name of its product from the name of the complainants' product. In doing this and at the same time preserving the rights of both parties and of the public in the use of a single sounding name, great difficulty is involved. Yet it must be surmounted, for the thing must be done. To this end we think that the decree fairly may require that the cartons and bottles containing the respondent's product shall bear labels or printing which in themselves clearly distinguish the product from that of the complainants, and also that the respondent's labels and printing on cartons and bottles and in advertisements shall state affirmatively and prominently that the preparation is not that of Barton Manufacturing Company and is not to be sold or dispensed as "Dyanshine" and is not to be used as such by jobbers or retailers when filling orders or meeting calls for the latter. Warner & Co. v. Lilly & Co., 265 U. S. 526, 44 S. Ct. 615, 68 L. Ed. 1161. With these general suggestions, the details and form of the injunction can be more satisfactorily determined by the learned trial court.

The decree is reversed and the cause remanded to the District Court with directions that the bill be reinstated and proceedings had in conformity with this opinion.