**CHAPPELL et al. v. GOLTSMAN et al.**

Civ. 636.

United States District Court
M. D. Alabama. N. D.

Sept. 20, 1951.

See also, D.C., 88 F.Supp. 784.

---

Francis H. Hare, and Jennings & Carter, all of Birmingham, Ala., and Hill, Hill, Stovall & Carter, Montgomery, Ala., for plaintiff.

Godbold & Hobbs, Montgomery, Ala., and Beekman Aitken, New York City, for defendant.

KENNAMER, District Judge.

This is a suit for a temporary and permanent injunction and for money damages for the alleged infringement of a trade mark and for unfair competition.

A. N. Chappell and S. M. Chappell began business in Birmingham, Alabama in 1921 under the trade name Ancco. This name was coined by taking the initials of A. N. Chappell and adding the abbreviation for Company. In 1924 Ancco adopted the trade mark Bama for its products, which they registered with the United States Patent Office in 1926 and in 1928 the name of the Company was changed to The Bama Company and the use of the name Ancco was discontinued. In 1946 the trade mark Bama was renewed with the Patent Office.

When the two Mr. Chappells began business in 1921, both were citizens of Birmingham, Alabama, and have continued as such until this day. The Company was formed in Alabama for the purpose of manufacturing certain products and the initial sales area of those products was Alabama. The business began with a capital outlay of some $7,500 and has grown

progressively to be a business which, in the year 1950, had gross sales of over four and one half million dollars. In 1933 the plaintiffs started operating a plant in Houston, Texas, and in 1937 built a new plant there. Plaintiffs began selling their products in states other than Alabama in 1924. About fifteen percent of the products produced by the plaintiff company are made from blackberries.

During an eight year period from 1941 to 1948, the plaintiffs spent $231,000 on advertising their products. This amount does not include money spent in so-called good will advertising. This is an average of $28,875 per year on advertising. The company serves a territory composed of Georgia, Kentucky, Florida, Mississippi, Louisiana, Tennessee, North Carolina, South Carolina, Alabama, Arkansas, Texas, and a part of New Mexico. If the advertising were distributed equally among these states, it would amount to $2,406 per year per state.

The plaintiff company employs between fifty and sixty employees in the Birmingham plant, a few more than this number in the Houston, Texas plant. It operates a total of nine trucks; five in Birmingham and four in Houston.

The plaintiffs have never manufactured wine or other alcoholic beverages and have no intention of ever doing so.

The defendant company, Alabama Growers Association, Inc., is owned by the defendant Goltsman, his wife, and son. Defendant Goltsman, having been in the wine business for several years in Montgomery, formed this new company to cooperate with the Chilton County Growers Association for the purpose of manufacturing a blackberry wine from Chilton County blackberries. In 1948 the defendant Association began the sale of Bama Wine, which was produced from Chilton County, Alabama blackberries by the Monarch Company of Atlanta, Georgia and then shipped to the defendant Association where it was bottled and sold under the label Bama.

The defendant Goltsman, a well known sports enthusiast of Montgomery, a former owner of the Montgomery Baseball Club,

selected the name Bama for this particular brand of wine, so he testified, because it was the nickname of the State of Alabama; the football teams of the University of Alabama are called by that name; two of his boys attended the University of Alabama; the wine was to be manufactured from Alabama grown blackberries, and the wine was to be bottled and sold exclusively within the State of Alabama..

Goltsman further testified that at the time he selected this name for this particular blackberry wine, he had never heard of the Bama Company of Birmingham and Houston and did not know of the products they manufactured under the brand name Bama.

This court has approached the infringement and unfair competition allegations from these aspects:

(1) Whether the word Bama is primarily geographically descriptive.

(2)· If geographically designative, whether it has acquired secondary significance;

(3) Whether there is confusion or likelihood of confusion in the mind of the public as to the origin of the products of the plaintiff and those of the defendants;

(4) Whether the plaintiffs are entitled to the exclusive use of the word Bama on products for human consumption due to an association in the public mind between the plaintiff company, its products, and the word Bama.

(5) Whether, because of its numerous uses, including trade uses, all elements of originality and distinctiveness which may have ever adhered to the word, have long since been lost.

This court, in the consideration of testimony, cannot disregard the human element. All of the witnesses for the plaintiffs impressed the court as being good citizens, however, without casting any reflections on any of them, they can be classified as follows:

(1) Active, zealous members of the Womens Christian Temperance Union of Birmingham and Montgomery, anxious to take advantage of every opportunity to crusade against alcoholic beverages.

(2) Citizens of Birmingham, Alabama and Houston, Texas who live in close proximity to the two plants of the plaintiff company.

(3) Citizens of Georgia and South Carolina who, due to personal acquaintanceship with the two Mr. Chappells, or because of business dealings with the plaintiff company, are very familiar with the company and its products.

There were, of course, two or three witnesses who would not fit into any of these classifications.

There is evidence that the plaintiff company enjoyed a very favorable position in buying the producers' blackberries in Chilton County, Alabama until the advent of the defendant Goltsman and associates into that field to compete with them in the buying of such berries, whereupon the plaintiffs' purchases of blackberries from the grower's association in that County materially decreased and in one year ceased altogether.

When this evidence is weighed with the other evidence in the case showing that numerous other concerns in Alabama and elsewhere are producing various articles such as food and soft drinks under the same colloquial name Bama without being sued, the question arises: Is all this effort expended to re-establish the plaintiffs' favorable position as a buyer of Chilton County blackberries? Is the United States trade mark law to be used to give effect to such results?

This court is well aware that the defendants are not licensed to invade the rights of the plaintiffs because others might be doing the same thing; however, testimony that many other business establishments in Alabama and elsewhere use the word Bama as part of their trade name or as a trade mark for products is particularly significant in determining the meaning of the word, especially as to whether it is geographically descriptive, and also whether it has acquired secondary significance. It could be that such a word belongs in the public domain and is incapable of being the exclusive property of the plaintiffs.

■ "The law governing trade-marks", says Judge Woolley in Barton v. Rex-Oil Co., Inc., 3 Cir., 2 F.2d 402, 404, 40 A.L.R. 424, "is but a branch of the law regulating trade competition. The policy of this law is to foster, not to hamper, competition and it permits a monopoly in the use of a trade-mark only when it has become the absolute and exclusive property of the first user—good against the world. A merely descriptive name can never become such property, [William R.] Warner & Co. v. [Eli] Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; and the utmost the first user of such a name after it has acquired a secondary meaning can insist upon is that no one shall use it against him in an unfair way. Accordingly, the second user becomes an infringer only when he makes an unfair use of the mark. Not any competition, but only unfair competition on the part of such user is actionable." See Delaware & H. Canal Co. v. Clark, 13 Wall. 311, 20 L.Ed. 581, and other cases.

■ "The test of secondary meaning is whether the trade-mark has become broadly known to the public as denoting a product of certain origin. Therefore, in looking for a secondary meaning this court is controlled by the fact that such a meaning has been acquired in the mind of the public rather than by the time it has taken for that fact to become established." 2 F.2d 402, 405.

Secondary meaning is association, nothing more. It exists only in the minds of those who identify some article of commerce or some business house by some name or sign and associate the two in their minds. Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. 554, 28 S.Ct. 350, 52 L.Ed. 616.

Has the word Bama become broadly known to the public as denoting products of the plaintiff company?

The court was particularly impressed with the testimony of Mr. Winstead, of the Alabama Feed Mills of Tuscaloosa, Alabama. This large concern manufactures and sells under the trade name Bama livestock and poultry foods and corn meal for human consumption. It has used the trade name Bama since 1945. This concern does an extensive business in Alabama, Florida, Louisiana, Mississippi, and Georgia; however, ninety eight percent of its corn meal is sold in Alabama and each sack bears the imprint Bama. The corn meal is made from corn purchased in Alabama. At the time the name Bama was selected as its brand name, so Mr. Winstead testified, he had never heard of the Bama Company of Birmingham. The name Bama was selected, so he testified, because the name of the company contained the word Alabama and Bama was short for Alabama; all its products were to be made in Alabama; the company was located in Alabama; the label on all its products was to have a picture of the map of the State of Alabama and of the goldenrod, the State flower at that time.

The Alabama Feed Mills advertises these Bama products extensively in all the states in which it does business, and the advertising is varied. There are aprons with the words Bama Feeds inscribed thereon for the wholesale and retail houses with whom it does business; metal signs for roads and highways, "gopher" matches and thermometers, all with Bama Feeds or Bama corn meal, or both, printed thereon.

Another large concern making products for human consumption and using the word Bama in its trade name and as a trade mark is The Bama Pie Company of Dallas, Texas. This company began operations in 1927. It was begun by a Mr. and Mrs. Marshall. Mrs. Marshall was born in Selma, Alabama. Her given name, according to an exhibit in evidence, was Alabama and her nickname was Bama. She was noted for being a splendid cook. Bama pies are sold by Bama Pie Companies in Alabama, Oklahoma, Texas, Tennessee, Georgia, Mississippi, and Louisiana. There are eleven separate pie factories and their total gross sales for the year 1950 amounted to over three million dollars and the number of pies sold in that year was approximately fifteen million.

One of the aspects of unfair competition is whether the defendants in using the word Bama, if and after it had acquired

secondary meaning, was reaping benefits to which it was not entitled.

█ Another aspect of unfair competition is whether there is confusion as to the source of origin of the products of the plaintiffs and the defendants.

The court made comment from the bench during the trial that seemed to mislead counsel for the plaintiffs as to what the court had in mind in regard to the matter of confusion. The court stated that it would be easier for confusion to exist if the two companies were manufacturing the same product at the same location and using the same trade name, than it would if the two manufactured entirely different articles at different places and there was printed on the label the name and location of the company which manufactured each article. Counsel for the plaintiffs seemed to think the court thought there had to be competition. Confusion, not competition, is the real test.

"Though relief is not to be denied if the businesses are non-competitive, the apprehension of confusion is less in non-competitive than in competitive businesses." American Automobile Ins. Co. v. American Auto Club, 9 Cir., 184 F.2d 407, 410.

The witnesses who testified orally and by depositions for the plaintiffs, mostly citizens who live in and around Birmingham, Alabama and Houston, Texas, where the plants of the plaintiffs are located, testified as to the confusion that existed in their minds as to the source of origin when they first saw advertisements on bottles of wine with the Bama label on it. This, no doubt, would be true with some persons living in these localities. However, the confusion must exist in the mind of the public generally, not with a few.

"As 'probable confusion cannot be shown by pointing out that at some place, at some time, some one made a false identification,' so the possibility that in rare and isolated instances relatively few persons may carelessly mistake the source does not warrant relief." American Automobile Ins. Co. v. American Auto Club, 9 Cir., 184 F.2d 407, 410.

An equal number of witnesses for the defense testified that no confusion existed in their minds when they first saw advertisements on bottles of the wine bearing the label Bama, and they offered as an explanation for the absence of such confusion that one company was engaged in the manufacture of foods and the other wine; that the two products were sold in separate establishments; that the word Bama on any product means only to them that it was made in Alabama or had some connection with Alabama; and that, there are so many business concerns in Alabama that use the word Bama in their trade name or as a trade mark that they do not associate a product with that name on it as being the product of any particular concern unless they read the label to find out who manufactured it.

Mr. Henson, of the Bama Pie Company, of Montgomery, Alabama, and Mr. Winstead, of the Alabama Feed Mills of Tuscaloosa, Alabama, both testified that they had never had a complaint from anyone that there was confusion as to the source of origin as to their products and the products of the plaintiff company. The defendant Goltsman also testified that no statement had ever been made to him by anyone about confusion as to the source of origin between his wine and the products of the plaintiff company.

Counsel for the plaintiffs placed much emphasis on the affirmative nature of the testimony presented by the plaintiffs that confusion did exist in the minds of such witnesses, whereas, the testimony of the defendants' witnesses was in the negative. It was counsel's insistence that such affirmative testimony should be more convincing; that it should have more consideration, and that it should carry greater weight.

If the court follows such an approach to the consideration of testimony, such would be most damaging to the plaintiffs in dealing with the meaning of the word Bama. Defendants' witnesses testified affirmatively that such was the nickname of the State of Alabama; that they had heard the State of Alabama referred to as Bama

on numerous occasions, and that the use of the word Bama on products means only to them that it is produced in Alabama or has some such connection with Alabama. Of course, no witness admitted to hearing the word used in such an awkward expression as: "I am from Montgomery, Bama." Mrs. Lovett testified that on trips to New York she was referred to as the lady from Bama; a witness testified that when in the military service boys from Alabama were referred to as being from Bama; a witness testified that she was referred to as the girl from Bama while on a trip to California; a witness stated that on a visit to New York, when asked where he was from, he replied Bama; a witness testified that a drunk soldier cursed him and the people of Bama when he refused to sell him any liquor when he came into his business establishment.

The testimony for the plaintiffs in regard to the State of Alabama being known by the name Bama, was in the negative. Most of them did state that they had heard the University of Alabama and the University of Alabama football teams referred to by the name Bama.

The court knows of no way to combat affirmative testimony other than with negative testimony, in such instances.

Witnesses who testified for the plaintiffs and who made careful and diligent search of newspapers published in the Birmingham area over a period of years, found instances in papers published many years ago of the use of the word Bama as referring to the State of Alabama. Mr. Hudson, a witness for the defendants, testified that such a word is an abbreviated affectionate appellation for the State of Alabama and the uses of such abbreviated words are considered as undignified nicknames and the general rule is not to use them except on the sport pages. Mr. Hudson is assistant editor and manager of the Montgomery Advertiser and has had many years experience in the newspaper business.

Certain objections were made by the defendants to certain questions propounded to witnesses who testified by depositions, and all such objections are overruled.

Based on the testimony and the evidence presented in this case, and after careful consideration of the briefs filed by plaintiffs, defendants, and by amicus curiae on behalf of the Chamber of Commerce of the City of Tuscaloosa, Alabama (opposing plaintiffs' contentions), the court makes the following findings of fact, conclusions of law, and decree:

### Findings of Fact

1. On October 19, 1926, plaintiffs were granted certificate of trade mark registration No. 219,358, by the United States Patent Office for mayonnaise, peanut butter and fruit in sugar, in Class 46, Foods and Ingredients of Foods, which was renewed October 19, 1946.

2. Plaintiffs have never been granted a certificate of trade mark registration by the United States Patent Office for wine, nor have they ever applied for such certificate.

3. The word Bama is a contraction of the word Alabama, is commonly used as a nickname for the State of Alabama, and is descriptive of the State of Alabama.

4. The word Bama is geographically descriptive and is primarily descriptive as applied to plaintiffs' goods.

5. Plaintiffs' use of the word Bama as a trade name and as a trade mark has not been to such an extent that it has become broadly known to the public as denoting a product of the plaintiff company.

6. Plaintiffs have not been the exclusive user of the word Bama in connection with the manufacture and sale of their products to such an extent that an association has grown up in the public mind between the plaintiff company, its products, and the word Bama.

7. There are numerous business establishments all over the State of Alabama which use the word Bama in their trade name or as a trade mark and have made such use for many years. Some of them are:

In Tuscaloosa: Bama Finance Co.; Bama Beauty Parlor; Bama Bowling Center; Bama Cleaners; Bama Drug Co.; Bama Eat Shop; Bama Theatre, and several others.

**976**

In Talledega: Bama Realty Co., and Bama Service Station.

In Alexander City: Bama Theatre.

In Decatur: Bama Cigar & Candy Co.

In Town Creek: Bama Theatre.

In Gadsden: Bama Theatre.

In Dothan: Bama Wholesale Co.

In Cullman: Bama Cafe.

In Athens: Bama Cafe.

In Phenix City: Bama Club Restaurant; Bama Cafe

In Mobile: Bama Drive-In Theatre.

In Birmingham: Bama Fuel Co.; Bama Grill; Bama Hardware Stores, Inc.; Bama Lumber Co.; Bama Sheet Metal Co.; Bama Super Market; and Bama Trailer Sales.

In Montgomery: Bama Distributing Co.; Bama Foundries; Bama Oil Co.; and Bama Pie Co.

In Demopolis: Bama Auto Parts Co.

In Brewton: Bama Beverage Company, which bottles a soft drink bearing the name Bama and a map of the State.

8. The word Bama, a nickname for the State of Alabama, through long general use by numerous business establishments, both as a trade name and a trade mark, has lost all elements of originality and distinctiveness and has not acquired a secondary meaning in the mind of the public as denoting any particular business concern or the products of any particular business concern.

9. The reputation, credit, and business of the plaintiff company are not impaired by the defendants using the label Bama on blackberry wine, which they bottle and sell in the State owned liquor stores of Alabama.

10. Plaintiffs' products are sold only in the wholesale and retail grocery stores and never in wholesale or retail liquor stores in the State of Alabama.

11. Defendants' wine is manufactured from blackberries grown exclusively within the State of Alabama, the wine is bottled within the State of Alabama; and the wine is sold only to the Alabama Beverage Control Board.

12. Defendants' wine is sold only in retail liquor stores to the public and never in wholesale or retail grocery stores.

13. Plaintiffs have never manufactured or offered for sale wine, and have no intentions of doing so.

14. There has been no confusion on the part of the general public as to the source of origin of plaintiffs' and defendants' products and there is no likelihood of such confusion in the future.

15. Any element of bad faith, unfair competition, or perfidious dealing on the part of the defendants is here lacking.

Conclusions of Law

1. The court has jurisdiction of the parties and of the subject matter involved in this cause of action.

2. The word Bama being a contraction of the word Alabama, commonly used as a nickname for the State of Alabama and geographically descriptive, and primarily geographically descriptive as applied to plaintiffs' goods, the plaintiffs not having been the exclusive user of such word in connection with the manufacture and sale of its products to such an extent that an association has grown up in the public mind between the plaintiff company, its products, and the word Bama, the use of the word Bama by the defendants as a trade mark for blackberry wine does not constitute an infringement of the plaintiffs' registered trade mark for mayonnaise, peanut butter, and fruit in sugar.

3. Since there is no confusion or likelihood of confusion in the mind of the public as to the source of origin of the plaintiffs' products with those of the defendants, the use by the defendants of the trade mark Bama on Blackberry wine is not an infringement of the plaintiffs' registered trade mark for mayonnaise, peanut butter, and fruit in sugar.

4. The word Bama, a nickname for the State of Alabama, through long general use, has lost all elements of originality and distinctiveness and has not acquired a secondary meaning in the mind of the public as denoting the products of any particular producer and is available for use as a trade mark for all who, fairly and in good faith, and where no general confusion or likelihood of confusion exists in the mind

of the public as to the source of origin of such goods, choose to make use of it.

5. The plaintiffs are not entitled to the relief sought.

6. The defendants are not entitled to recover any damages under their counterclaim.