SCHREIBER MILLS, Inc. v. O. A. COOPER CO., Inc.

Civ. No. 38–48.

United States District Court
D. Nebraska, Lincoln Division.

Nov. 2, 1949.

C. Earl Hovey, of Kansas City, Missouri, Watkins & Watkins, of St. Joseph, Missouri, and Beghtol & Rankin, of Lincoln, Nebraska, for plaintiff.

Robert VanPelt (VanPelt, Marti & O'Gara), of Lincoln, Nebraska, for defendant.

DELEHANT, District Judge.

The plaintiff, a corporation organized under the laws of Missouri, filed its complaint in this action on August 17, 1948 under its then corporate name of Schreiber Milling and Grain Company, against the defendant, a Nebraska corporation. The matter in controversy exceeds in value the sum of $3,000. Whether it be premised upon the infringement of a technical Trade-Mark in violation of statute, Title 15, U.S.C.A. § 1121, or upon diversity of citizenship, Title 28 U.S.C.A. § 1332(a) (1), jurisdiction unquestionably exists. And the plaintiff resorts to it and the defendant does not challenge it.

In its complaint, the plaintiff, basing its claim upon prior origination and employment, and upon registration under the National Trade-Mark law, and upon alleged acts of the defendant amounting to infringement and unfair competition, demands a decree establishing its prior use of, and exclusive right in and to, the Trade-Marks Lassy and Sweet Lassy in application to live stock feeds, and adjudging that the use by the defendant of the terms Lassy, Lassie and 'Lasses, or

either of them, or any phonetic equivalent of them, or either of them, in connection with stock feeds constitutes unfair competition and a violation of, and infringement upon, the plaintiff's rights; a perpetual injunction against such use; an accounting against the defendant of its profits by reason of its use of such names; a judgment for damages for such alleged infringement and unfair competition; the destruction of advertising and publicity material incident to the alleged infringement; costs and general relief.

In its answer, the defendant generally admits the use by the plaintiff in the stock food trade within a limited area of the term Lassy and, inferentially, Sweet Lassy, (though claiming that others had made use prior to the plaintiff of Lassy) and its own subsequent employment for a brief period of time in 1948 of brand names for certain stock foods containing the word Lassie and, thereafter and still, of brand names for such foods containing the term 'Lasses; alleges its abandonment in its brand names, upon demand by the plaintiff, of the word Lassie; denies that, in its actions in the premises, it ever intended to or did engage in unfair competition with the plaintiff or infringe its Trade-Mark or Trade-Marks; and prays for the dismissal of the complaint.

Both the complaint and the answer, each with its supplemental pleading, deal with many matters of detail which, the court considers, need not now be set out or further summarized. The facts, as the court proceeds to find and announce them, have been assembled in full view of the averments of the pleadings. The parties conducted during the pendency of the action certain discovery proceedings; a pretrial conference was held and formal report thereof made; trial was had to the court, but only upon the issue of the plaintiff's right to injunctive relief; and on that issue the case has been submitted upon exhaustive briefs of counsel. By agreement of the parties trial has not been had of the issue of the plaintiff's right to or the amount of recovery for damages or profits.

Both parties, through their respective corporate entities and individual predecessors, have long been engaged in the production and marketing, among other things of various feeds for domestic live stock, the plaintiff having its principal place of business at St. Joseph, Missouri and the defendant having its original and principal place of business at Humboldt, Nebraska, and within recent years another plant at Beatrice, Nebraska.

The founder of the plaintiff's business, still living and active, in its management and operation, is Allen B. Schreiber, Sr. The business has continued for more than thirty-one years, probably some where near a half century. The plaintiff enjoys a high standing, and its products are highly regarded within its trade territory. It is generally and familiarly referred to as Schreiber Mills. The defendant's business was established in 1879 by one O. A. Cooper, now deceased, and it has continued as a family operation. It, too, and its products have attained and enjoy a high standing in its trade territory. In the course of time, each business passed under corporate control, but with a comparatively slight actual change, in consequence of the persistence in each instance of the founder's direction, and, in the defendant's case, later that of his descendants. While the general business of the plaintiff has always included the preparation and sale of live stock feeds, its relations to the particular products and Trade-Marks or trade names involved in this action are of shorter duration. So, too, while the defendant has been engaged for some twenty-one years in the stock feed business, its dealings in the precise products and brand names before the court have been very recent.

Prior to a time which may be fixed at about 1924, the plaintiff prepared and sold live stock feeds in bulk. Among those feeds were mixtures of ground grains with a high molasses ingredient, whose contribution to the composite mass included palatability and cohesiveness. Such products were objectionable on the score of their accumulation in blocks or chunks of

such sizes as to be inedible until they were chopped or broken into smaller pieces.

But by a date shortly prior to the year 1924, Allen B. Schreiber, Sr. had perfected a machine, apparently only for the use of his own company and not shown generally to have been manufactured for sale, upon which he obtained a patent or patents, by means of which a mixed mass of the feed with a high molasses content is forced under pressure and while heated, through round holes of desired diameters. Each machine has several hundred holes of that character bored into a single metallic plate. Under such pressure, the product emerges from the holes compressed into a cylindrical shape. Each cylindrical piece is allowed to attain such length after extrusion from its moulding hole that it falls of its own weight upon a drier belt by which it is conveyed through a drying process. Thereby, a small parcel of the stock food results which the plaintiff in its trade practices characterizes as a "pellet". That term is not unique with the plaintiff, but is used generally in describing the moulded form of any such product. These pellets are produced by the plaintiff in two diameters, the smaller, or "pea size" being three-eighths inch, and the larger or "range size" being approximately one inch, in diameter. Pellets of both sizes vary in their lengths between one-fourth inch and one inch.

The small masses formed in that fashion are characterized as soft pellets, because their component parts are not forced under high pressure into a more concentrated and harder mass. They are naturally subject to some erosive and disintegrating action through excessive handling and delay in consumption, slightly impairing the permanent stability of the pellets and producing a fragmented but edible dust like residue. However, the method of manufacture and its result are entirely practicable in the trade. And a witness for the defendant explained, and the court finds, that feeds of the character involved, with a molasses content as high as that of the plaintiff's product—and also part of the defendant's products, vide infra—may be compressed only into soft masses and may not practicably be made and marketed as hard pellets.

It should be observed that while the pellet form is the principal present state in which the plaintiff's products are prepared, it is not the exclusive manner. Some of them are in meal form and some in either pellet or meal style.

Early after the introduction of its pellet product just described, the plaintiff devised and applied to it the name Sweet Lassy; and from some time in 1924 it has marketed the product under that name. On June 24, 1927 it applied to the United States patent office for the registration in its name of Sweet Lassy as a Trade-Mark under the Act of February 20, 1905, for stock feed, in class 46, Foods and ingredients of foods, claiming the initial application date of September 5, 1924 and continuous use thereafter. Registration was made and certificate thereof issued under date of November 15, 1924. The certificate was renewed under date of October 21, 1947 for the term of twenty years from November 15, 1947, on that occasion under the Act of July 5, 1946.

On July 12, 1946 the plaintiff, having theretofore initiated and prosecuted the sale of a dog food under the name Lassy, applied to the United States patent office for the registration in its name of Lassy as a trade mark under the Act of February 20, 1905 for a dog food composed of certain designated ingredients in unstated proportions, in Class 46, Foods and ingredients of foods, claiming the initial application date of about November 27, 1944, and continuous use thereafter. Registration was made and certificate thereof issued under date of July 15, 1947.

In the matter of the registration and use by others than the parties to this action of trade names or Trade-Marks alleged by the defendant to be destructively similar to those claimed and relied on by the plaintiff (postponing for the present any expression of their relevancy or materiality) the court finds the following to be facts.

(a) Staley Milling Company, North Kansas City, Missouri, upon application to the United States patent office therefor,

claiming first use as of January, 1939, was issued on May 14, 1946 registration certificate for the registration in its name of Pro-Lass as a Trade-Mark. And it uses that name in the manufacture and sale of a food for hogs with a trade area that is not clearly defined in the evidence beyond its inclusion of Missouri and Nebraska.

(b) Abingdon Milling & Cattle Feeding Company, Abingdon, Illinois, pursuant to an application claiming first use as of April, 1914, on March 24, 1931, received from the United States patent office the registration in its name of the Trade-Mark Molasso for stock food, Class 46. The evidence does not establish whether any, or what, use has been made of the name by Abingdon Company.

(c) Application was made, with first publication on November 30, 1937, by Southern Milling Company of Augusta, Georgia, claiming initial use in 1927, for the registration in its name of Lasso for a dairy feed, Class 46. But the evidence discloses no registration in pursuance of that application. Nor is any actual use of the name by the claimant established.

(d) Federal Mill and Elevator Company of Lockport, New York, on April 3, 1922, with first publication December 12, 1922 made application for registration under the Act of February 20, 1905 in its name of Lassie with a subjoined engraving cut of a young girl standing in a field of maturing wheat as a Trade-Mark for wheat flour Class 46, claiming first use as of October 27, 1915, and a previous registration under under date of April 11, 1916. Registration was granted April 24, 1923. This registration has since been renewed in the name of Federal Milling Company, Lockport, New York. The evidence does not disclose what use has been made of that registered mark.

The plaintiff has used the name Sweet Lassy in application to several of its products. Principal among these is Sweet Lassy cattle feed, a supplement to grain and other material in cattle feeding, and one of the products sold only in pellet form after the initial use of the pellet making machine. But it has also applied the name to a hog balancer and a dairy concentrate, as well as to some other products which have not been marketed for several years. The single word Lassy has been used in its business in identifying several stock feed products, including a milk producer, a calf meal, a dairy ration, a so-called Hi pro cattle feed, and a dry freshening supplement, and very recently a dairy concentrate and so-called "24% dairy supplement", and "alfa ration". By far the largest volume of such products has been, and still is the Sweet Lassy cattle supplement feed, although for the six years ending with 1948 the Sweet Lassy hog balancer has had extensive sales. And a product named Kattle Lassy 20% protein has also been made and sold. Of the feeds branded simply as Lassy the largest sales have been of the milk producer and Hi pro cattle Fattener, although the new product identified as an Alfa ration achieved substantial sales in 1948. Of the plaintiff's products characterized only as Lassy, two calf feeds do not have any molasses content. The foregoing enumeration of the plaintiff's products is not, and is not intended to be all inclusive, but is considered adequate for present purposes. Nor has the court set down exact sales figures for the several products. Due recognition has been taken, however, of the entire list of products and summary of sales of Sweet Lassy cattle feeds extending from 1924 to 1948 reflected in Exhibit 1, and of sales of other products, using the names Lassy and Sweet Lassy, from 1927 to 1948 set out in Exhibit 2. Upon the subject of volume of sales, it is considered sufficient to say that from January 1, 1924 to November 1, 1948 nearly five million sacks containing nearly a quarter million tons of the Sweet Lassy cattle feed were sold, of which the sales for the first ten months of 1948 were 349,-332 sacks containing 19,974.85 tons. Generally, the annual sales of that product have increased, though that record has not been invariable. The highest sales were made in 1928 and 1929; the lowest, after the initial year, in 1932.

The plaintiff has advertised its products extensively, systematically, and at large cost through its territory. Its advertising program upon the Sweet Lassy cattle feed

contemplates the expenditure of at least one dollar per ton of the product's sales; and it has spent at least that much in advertising. Its advertising has been made principally in farm and stockmen's papers, circulars or pamphlets, radio programs, store signs, road signs, and advertising novelties. The distribution of samples of the product is also a species of advertising in which it has engaged.

The plaintiff's trade territory includes Missouri, Iowa, Illinois, Nebraska, Kansas, South Dakota, Oklahoma, Colorado and Minnestoa and, for some of its products, Ohio. It formerly operated a now abandoned distribution center in Minneapolis, Minnesota serving, besides some of the area above identified, the additional states of Wisconsin and North Dakota, and, it may be gathered from some features of the testimony, prosecuting its Minnesota and South Dakota business more aggressively than it is now pressed. (One witness, for instance, omitted Minnesota from its present trade territory.)

Salesmen travel the territory for the plaintiff, selling its products to retail merchants and consumers, and, among the latter, especially to ranchers. Of those salesmen two operate regularly in Nebraska, in addition to whom a third man, a local dealer, covers a limited part of the state for some of the plaintiff's products on a commission basis.

The plaintiff's principal products are commonly sold to the trade in burlap bags, each with a capacity of one hundred pounds. This is particularly true of Sweet Lassy cattle supplement. The bags presently and for some time used by the plaintiff feature vertical parallel lines about an inch wide and at intervals of the same length painted in colors differing as to the products respectively packaged in the bags. However, on occasions when bags usually in the regular stock have not been available, some of the product has been marketed in other bags that could be used. And a few of its products, not including, as the court recalls, Sweet Lassy cattle supplement, are marketed in paper bags; and some products also in bags of sizes smaller than one hundred pound capacity.

The plaintiff by private arrangement with Allen B. Schreiber, Sr., pays him a stipend which it regards as a royalty for the employment of his soft pellet machines. However, it also owns and uses for the production in hard pellet form of certain of its feeds some four so-called California pellet mills. It does not use those latter machines in the preparation of Sweet Lassy cattle supplement, Lassy Hi pro, or Kattle Lassy.

The reach of the defendant's business operations is, and for many years has been, broad. It includes the purchase and sale of grain, the operation of grain elevators, farming, ranching, dealing in live stock, and the manufacture and sale of flour and its by products. Since 1928 it has also included the manufacture and sale of live stock feeds. That department of the business was opened concurrently with the coming into the family enterprise of Guy Cooper, Jr., presently Vice-president of the corporation. Since its inception he has had charge of the defendant's live stock feed business.

Its feeds have been prepared and sold in various forms, including mash, since 1934 hard pellets, and, more recently (vide infra) soft pellets. Continuously since 1928 it has used molasses in varying percentages in the preparation of some of its feeds.

Here the distinction—or, at least, a distinction—between hard pellets and soft pellets in the stock feed trade may be explained. They differ in apparent density, the hard pellets seeming to be more closely compressed and to possess a more glazed exterior surface, while the soft pellets appear to be less cohesive and to have a dull and rough surface. Without contradiction, an informed witness for the defendant testified, and the court finds, that a critical distinction between them lies in the ratio to the entire product of their respective molasses contents. Hard pellets cannot be made with a molasses ingredient greater than about twelve per cent by weight. And soft pellets cannot practicably be made with less than thirty per cent by weight of molasses, and commonly have about forty per cent.

The soft pellet feeds produced by each of the parties to this suit contain less than

fifty per cent by weight of molasses. The exact percentage is not shown in either instance, but it is fairly inferable that in each product it is probably between forty and forty-seven per cent.

Several manufacturers, besides the parties to this suit, make and sell molasses bearing stock feeds in the trade area of the parties or some part or parts thereof. They include the Tarkio Molasses Company, formerly of Tarkio, now of Kansas City, Missouri, the Famous Molasses Company, of Omaha, Nebraska, Allied Mills of the same place, Norfolk Mill and Elevator Company of Norfolk, Nebraska, and one Conley of Nebraska City, Nebraska.

At least two manufacturers make and sell machines for the preparation of soft pellets in the feed trade. One of these is The California Pellet Mill Company of San Francisco. The other is Wenger Molasses Mix Company of Sabetha, Kansas. The California Company also makes hard pellet mills, four of which the plaintiff has and uses, (supra). The defendant has and uses both the soft pellet mills and the hard pellet mills of the California Company's manufacture. It obtained and used the hard pellet equipment before its acquisition of the soft pellet machine or machines.

The defendant entered upon the manufacture and sale of a cattle feed prepared in soft pellets in February 1948. It had received its soft pellet mill late in 1947 upon an order placed much earlier than that. It had previously, and since 1934, manufactured and sold and still makes and sells feeds in hard pellets, including, since early in 1946, a product known as Lucky Seven.

The defendant's trade territory includes the states of Nebraska, Kansas, Missouri, Iowa, Colorado, Wyoming and South Dakota. It sells its stock feeds to dealers and consumers. It markets through traveling salesmen and direct orders. It advertises systematically and extensively and employs farm papers, live stock trade papers, billboard displays, samples of products, and radio material among its advertising media. The precise extent and costs of its advertising programs have not been disclosed

but enough has been established to warrant a finding that both have been substantial. So also have been the sales of its products, though for present purposes their exact amounts need not be set down.

To its soft pellet cattle feed, upon its introduction in 1948, the defendant first applied the name Lucky Lassie Lumpets. Lucky was taken from the name of its own Lucky Seven; and from the same source was also used by it in designating, at about the same time, a calf starter as Lucky Laddie. Lumpets was and is merely descriptive of the form in which the product is made. For Webster's New International Dictionary (1925) defines "lumpet" as "a little lump. *Rare*". Neither Lucky nor Lumpets resembles any name employed, or registered as a Trade-Mark by the plaintiff, so far as the present record discloses. Lassie remains for further consideration, (infra).

The California Company's soft pellet mill with which the defendant's soft pellet product is made has knives which cut off the pellets as they are extruded from the holes in its drum or head, thus achieving a greater uniformity in their length than is sought or obtained in the plaintiff's like product. The defendant's hard pellets have also been made on a California mill (supra).

The defendant's soft pellet product is made in cylindrical masses five-sixteenths inch in diameter. Its hard pellet product is made in three sizes, one a seven-eighths inch cube, another an oval shaped mass whose width in its larger dimension is about one and three-fourths inch, and the third, a so-called wafer with two parallel and joined cylinders. The last item was quite aptly described by a witness as resembling a short segment of the end of a filled shot gun barrel. These descriptions apply irrespective of the changes in the names applied to the several products.

In May, 1948 the defendant first made and sold in hard pellets a product adaptable especially for summer cattle range feeding, to which it applied the name Summer Lassie. In appearance this product closely resembles its Lucky Seven. The court, however, does not find or declare that they are

identical, for the court does not recall that the evidence discloses the formulae of the two products.

For its Lucky Lassie Lumpets the defendant set on foot a formal and systematic advertising campaign through its then regularly employed advertising agency, designated for convenience as, Ayres Agency. That agency had also undergone in the interval prior to trial a presently irrelevant change in name. On April 12, 1948 the defendant, by Guy Cooper, Jr., wrote and sent to Ayres Agency a letter initiating the program and inviting the agency's activity in the project. The letter contained the following sentences:

"* * * We have brought out a new type of molasses cattle supplement, which we call Lucky Lassie Lumpets. We have had it on the market a little over a month now, and without any advertising or promotion whatsoever, it seems to be a pretty fair seller. I enclose a tag on the product and under separate cover a small sample of the product itself. I also enclose the circular on an almost identical product put out by Schreiber that has been on the market for a long time."

The letter also made several suggestions of advertising details.

The Ayres Agency, thus invited, prepared a preliminary layout for proposed stock trade newspaper advertising and sent it to the defendant. That layout will be adverted to shortly hereafter. On April 23, 1948 the defendant, again by Guy Cooper, Jr., returned it to the agency with a letter in which several suggestions were made touching the language in which representations of the product's virtues should be couched. Besides these, it contained the following sentences:

"I am returning to you the layout and copy on the Lucky Lassie ad. I think we will run this once only in the Nebraska Farmer. However, I would like to run it once a month in the Kansas City, St. Joseph, and Omaha stock papers until further notice.

"* * * and probably you could draw, patterning after the picture on Schreiber's a man holding a sack of feed with the pellets pouring out into a bunk."

Certain other features of this letter will also be mentioned hereafter.

Through the Ayres Agency, the material was filled in and the advertising layout for that item was completed and a commitment was made for its publication monthly till further notice by the defendant (but with a contemplated run of once a month for about four months) in the Kansas City, St. Joseph and Omaha daily stockmen's journals.

It was published in the Kansas City paper on May 21, 1948, and was also published on or about the same date in the St. Joseph and Omaha papers. Each such publication was the first of the scheduled monthly repetitions of the same advertising matter. All of the publications involved the preparation of only a single item of material. However, after the detection of the error next discussed the publication was never repeated.

Through an error occurring in the first instance in the Ayres Agency office, and undetected by the defendant in its handling of the material for that advertisement, the word Lassie intended to be used in the advertisement in reference to the product was misspelled as Lassy both in the material furnished to the papers and in the printing thereof. However, once detected, the error was not repeated in any other advertising of the product.

At this point, the court pauses to note and pass upon a matter much argued in the plaintiff's brief. The ruling and discussion of it are appropriately set out here because the issue is one of fact. The plaintiff's counsel seize upon the May 21, 1948 advertisement, and deny that the use therein of the word Lassy was mistaken, and insist that it was purposeful and deliberate. And pointing their argument to the defendant's entire conduct and particularly to its present branding of its soft pellet feed, they repeatedly charge the defendants in substance, and sometimes in ipsis verbis, with "backing away from Lassy to Lassie, thence to Lasses". That contention is sim-

ply untrue factually. The defendant never knowingly or intentionally used the word Lassy in application to its product, and its appearance in the one advertisement was due to an error and wholly unintentional. Many things conclusively prove that to be true; and much of the material was introduced by the plaintiff. Upon this trial the plaintiff plowed a part of its furrow with the defendant's ox; for the defendant in 1948 terminated its employment of Ayres Agency, and one of the latter's employees with its files furnished considerable evidence for the plaintiff.

To start at the beginning, the defendant's letter to the agency under date of April 12, 1948 (supra), named the product as Lucky *Lassie* Lumpets (emphasis added) and invited the preparation of advertising material for the product thus named and not otherwise. Then the agency's initial rough layout is before the court as Exhibit 51. Its heaviest type reference to the product calls it Lucky Lassy Lumpets. But on its left margin in smaller, yet still heavy, type appears the display material "Why you should feed Lucky Lassie Lumpets". So, both spellings occurred in that first rough draft. When Cooper returned that layout on April 23, 1948 he included in his suggestions of arguments for the product, one for the printing, near the lower right side, of the legend: Lucky Lassie Lumpets—For Faster Fat & Finish, thus using the word Lassie on his own initiative. It is true that with that letter he also included a rewriting (Exhibit 52) of certain langauge theretofore suggested by the agency for insertion along with the display features of the advertisement in which the word Lassy appears three times in type. Whether the spelling in that particular exhibit originated in the defendant's office or was mistakenly prompted by the material first prepared by the Ayres Agency from which the exhibit was rewritten cannot be determined, for the primary material, of which it is manifestly a rewriting, is not in evidence. The defendant, from the initial introduction of its product, packaged it in bags spelling the challenged word as Lassie, never as Lassy, and never sold or attempted or intended to sell a single ounce of its product under a brand name containing a word spelled, Lassy. Of course, Guy Cooper, Jr., as a witness also explained the use of the word Lassy in the challenged advertisement as an error, occurring in the first instance in the agency's office and undetected and actually preserved in his own inadvertent and careless handling of the material. Standing alone, his manifest interest would be allowed to minimize the effect of his testimony upon the point. But it is confirmed by obvious facts, and it is inferentially conceded by the witness Swanson, of the Ayres Agency. The court has carefully studied the correspondence upon the subject between the St. Joseph attorneys for the plaintiff and the defendant, by Guy Cooper, Jr. It need not be summarized here. Cooper might well have been somewhat more frank with the attorneys in his letter of June 9, 1948 answering their letter of June 8, 1948. Instead, though he knew of the advertising error (see his letter of June 12, 1948, Exhibit 45), he was content sweepingly and repeatedly to deny the defendant's use of the word Lassy rather than to mention and acknowledge the mistake. But he might narrowly, though the court thinks erroneously, have construed the attorneys' letter as attributing the defendant's use of the word Lassy to "a cattle feed" rather than to the "advertising" of a cattle feed. Thus understood, Cooper's answer of June 9, 1948 was correct as a matter of verbal accuracy but surely not in spirit and in its implications in the light of the erroneous advertisement. Restated, the court finds that the defendant never made or marketed a product whose assigned name consisted of, or included, the word Lassy thus spelled, or used that word, so spelled, in the advertising of any of its products, except in the single advertisement published once in each of the three designated papers which erroneously and unintentionally carried the word. Specifically, the defendant never "backed away" from any use of that word.

The plaintiff's argument, in its brief, respecting the defendant's part in the mistaken advertisement, proceeds to the ex-

treme length of asserting that: "It appears to be a carefully planned scheme to copy Plaintiff in such manner that Defendant's advertising agency could subsequently be blamed." In the light of the entire record upon the point, such "mask and flash light" deduction is only doubtfully deserving of comment. It is certainly without foundation in reality.

The defendant did, however, advertise and propose to advertise as a settled and permanent program its product branded as Lucky Lassie Lumpets. It published advertisements in papers and pamphlets and provided itself with display advertising materials, some of which it put in place and much of which it retains.

And, along with that advertising, it projected and initiated a comprehensive advertising program covering its Summer Lassie product. That program, however, was deferred in its opening until late in May or some time in June 1948.

Among the steps in its introduction of its soft pellet product, the defendant purchased a large supply of one hundred pound burlap sacks of the ordinary and natural brownish color, stamped in bright blue with the words Lucky Lassie in rather strikingly irregular alignment, below which, in order and in blue color, were the words "Molasses cattle supplement", a cut of a steer's head, the words "for faster fat & finish", and the legend "Mfg. by Cooper Mills Humboldt, Nebr." The words Lucky Lassie were composed of letters whose shafts were about three-fourths inch wide and some three, others four, inches high, and the words "Cooper Mills", capitalized, were in letters whose shafts were three-eighths inch wide and one and three-fourths inches high. When it discontinued the use of the word Lassie, infra, it continued to use those bags; but, with two heavy parallel black lines largely, but not completely, covered the word, Lassie, and slightly above it stenciled in the word Lasses in letters three-fourths inch high. The bags thus originally prepared and also as altered did not resemble, except in size and their basic burlap material, the bags in which the plaintiff packaged and sold Sweet Lassy.

The defendant also has and uses a so-called "stock bag" on which in a large blue bordered red circle it has printed in blue characters offset by the natural bag material color the words, "Cooper's Best Feeds", beneath which are printed the words "compare results, The O. A. Cooper Company, Humboldt, Nebr." in capital letters and in three lines, the corporate name occupying the middle line. It uses that bag generally for the packaging of its products. It has recently used it for the packaging of its soft pellets, identifying the product by stenciling the words Lucky Lasses Lumpets in three lines in letters about an inch high. Similar use of the bag is made in the marketing of the hard pellet, for which the words Summer Lasses Cake are stenciled.

While it is not material here, Lucky Seven is packaged by the defendant in a specially devised burlap bag of which the distinctive features are those two words followed by a large figure "7" and the words "it's a natural" (which, so it is said, has some association with a game of chance well known in some quarters), and the name of the defendant.

By letter of June 24, 1948, the St. Joseph attorneys for the plaintiff, which meanwhile, had come upon advertising of the defendant's product, Lucky Lassie Lumpets, threatened the defendant with litigation unless the use of that term was abandoned. The defendant, after encountering some necessary delay in the matter, consulted its attorney upon the subject, and following certain communications by telephone with the plaintiff's attorney, agreed to, and did, abandon the use of the words Lucky Lassie in the branding, advertising and sale of its product. On July 3, 1948, by Guy Cooper, Jr., the defendant wrote Ayres Agency directing the cancellation of the Lucky Lassie Lumpets advertising schedule and attributing its action to the plaintiff's threat of suit. On July 6, 1948 Ayres Agency acknowledged that letter and advised of its compliance. Into the letter its writer inserted the following inquiry, "Does this alleged infringement include the Summer Lassie name? I rather imagine it does. It will be impossible to

cancel The Sandhill Feeder as it is a second cover set-up. Also, if so, the cancellation will include our outdoor program on Summer Lassie. If this is not correct please let me know." Up to that time, apparently up to and including the institution of this suit, the Summer Lassie operation had not been challenged by the plaintiff and probably was unknown to the plaintiff. To the Ayres Agency letter the defendant, by letter of July 7, 1948, replied: "I have your letter of July 6, 1948. I imagine that Schreiber will get after us on Summer Lassie, but until they do, we will let our schedule go right along. I imagine you noticed Schreiber's ad in the last issue of Nebraska Farmer. It is unusual for them to advertise in the Nebraska Farmer, but we are getting them stirred up and that is why they have." And later, on July 26, 1948, the defendant, but this time by one Seits, its sales manager, and not by Guy Cooper, Jr., wrote to the Ayres Agency: "I am enclosing a few folders on Cooper's Summer Lassie Grain Pasture Cubes. These came in today and we want to get them in our cooperative advertising book as soon as possible. Will you see that the salesmen get these so that they can start sending in direct mail on them at once." However, it is not shown that the folders actually reached the trade.

The defendant, through Ayres Agency, did briefly carry out at least some of its advertisement commitments on Summer Lassie. It published a few advertisements in farm journals, had pamphlets printed, and also procured the preparation of material for a substantial number of large posters. Of the item last mentioned, a few were put in place, but much the greater number were never used and are still in the defendant's possession.

However, between July 17 and July 24, 1948 the defendant abandoned both the advertising and the selling of any products under the names, Lucky Lassie Lumpets and Summer Lassie, or either of them. It continues to make both of the products. But to the soft pellet feed it has applied the name Lucky 'Lasses Lumpets, and to the hard pellet feed the name, Summer 'Lasses. Under those several names it has continued to make and market, and still makes and markets. the two products. And it has continued extensively to advertise both of them throughout its trade area.

At all times during which the defendant was planning for, and advertising and marketing its products known as Lucky Lassie Lumpets and Lucky 'Lasses Lumpets, and Summer Lassie, and Summer 'Lasses, it knew of the existence and business activities of the plaintiff and of its products, in a general way, and especially of Sweet Lassy cattle supplement. Some of its witnesses sought unconvincingly to minimize the extent of this information. But the court can not credit such disclaimers of knowledge. They impose too heavy a burden on ordinary,—or even judicial—credulity. Schreibers and Coopers were, and long had been, competitors in certain phases, at least, of their respective businesses. Their trade territories were common at many points. Humboldt, Nebraska and St. Joseph, Missouri are only seventy-five miles apart by rail and not greatly farther by improved public highway. And, most significantly, in his letter to Ayres Agency initiating the Lucky Lassie Lumpets advertising program, the defendant's vice-president disclosed his knowledge of the plaintiff's competing product and that it had been on the market for a long time. And shortly thereafter in the correspondence he again referred to the advertising material used by the plaintiff.

In introducing its products whose names are presently in controversy, the defendant had no formal intention to sell its products as the plaintiffs or to appropriate any of the trade names or Trade-Marks of the plaintiff. It intended to sell its product as its own, and it thought, mistakenly as the court is persuaded, that its initial selection of names including the word Lassie was within its right. However, it did know of the appeal to cattlemen of products of the general nature of those it was introducing, of the large trade in such products, however named, enjoyed by other feed makers, including the plaintiff; and it sensed the possibility and had the hope of profiting from the good will enjoyed by

such products generally, as reflected by their volume of sales in the trade. And it knew, or must be considered to have known, that in its application to products of the kinds in question, and within the trade territory common to itself and the plaintiff, of names containing the word Lassie, in the face of the plaintiff's long employment of Sweet Lassy, and, for less duration, of Lassy, it was inviting probable confusion in the minds of ordinarily prudent purchasers.

No evidence adequate to establish actual confusion among purchasers is before the court. There is some testimony of doubtful competency upon the point, but it falls far short of sustaining a judicial finding of actual confusion. It may be considered that the plaintiff did not seriously try to establish such confusion as a demonstrable fact. However, it has demonstrated to the court's satisfaction the reasonable likelihood of confusion among ordinary buyers in the plaintiff's trade territory of directly competing products under names containing the word Lassie, thus spelled.

The right of the defendant to make and market within its trade territory stock feeds having the ingredients and characteristics of its products, and particularly its soft pellet feed, is not directly challenged. Neither is its right to make them in the forms and shapes and sizes which it employs or its right generally to package them in bags or sacks of varying sizes. Those features of its operations, considered independently, are within the licit enjoyment of any one engaged in the live stock feed business, which is not itself closed against proper competitive invasion by persons or organizations newly entering the field. Of course, all of those factors are to be considered insofar as they may have significance in relation to the defendant's designation of its merchandise, and its advertising and sale, to the extent that those operations are drawn in question.

By way of legal conclusion the court, for the present, has to determine whether the plaintiff is entitled to injunctive relief against the defendant's employment (a) of the names Lucky Lassie Lumpets and Summer Lassie, and (b) of the names Lucky 'Lasses Lumpets and Summer 'Lasses, and, if and to the extent that such right exists, the appropriate reach of the injunctive order. Questions of a judgment for damages or profits or both are not now before the court. As to the challenged names, the court is persuaded that they must be regarded separately, those containing Lassie falling into one classification, those containing 'Lasses another.

While it may not be considered that the title of the plaintiff to its alleged technical Trade-Mark of Sweet Lassy, and, within its declared use, of Lassy, and the validity of those Trade-Marks are admitted by the defendant, they seem to be established, to the extent that they are not so admitted. The employment of the terms by the plaintiff in application to its products and their registration under the Act of 1905, and the renewal of the registration of Sweet Lassy under the Act of 1946, are unquestioned. The generality and extent of the use of the terms are sufficiently proved.

By section 16 of the Act of February 20, 1905, 33 Stat. at Large, p. 728, it was provided: "That the registration of a trademark under the provisions of this Act shall be prima facie evidence of ownership."

And the subject is more broadly covered in Title I, Section 7(b) of the Act of July 5, 1946, 15 U.S.C.A. § 1057(b), as follows: "A certificate of registration of a mark upon the principal register provided by this act shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein."

The latter language would seem to have direct application only to the plaintiff's registration of Sweet Lassy. The registration of Lassy in respect of a dog food was made under the Act of 1905, although the certificate of registration was issued after the operative date of the Act of 1946. However, the court does not regard the sug-

gested distinction as controlling in any degree in the present case.

After recognizing and declaring that Trade-Marks registered under the Act of 1920 (not involved on this occasion) may be attacked collaterally, contrasting that Act, in such respect, with the Act of 1905, the Supreme Court in Armstrong Paint and Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 323, 59 S.Ct. 191, 195, 83 L.Ed. 195, said: "The significant distinction between the two acts is the omission in the 1920 act of the provision of section 16 of the earlier act making the registration of a trade-mark prima facie evidence of ownership."

The 1946 Act makes no such omission, but rather reiterates and amplifies the provision.

To the statutory presumption of ownership of the marks, the plaintiff has added the admissions made in the pleadings, and formal proof of prior employment of the names Sweet Lassy and Lassy, especially the former. No evidence disproves it.

■ The extent to which names including the word Lassy or its equivalent have been either registered or used in application to products similar to those of the plaintiff is inadequate to impair the plaintiff's title to its Trade-Marks. This subject need not be more than mentioned, for there is no real collision between the plaintiff and any other employer of a like name. In actual use in the marketing of a hog food by Staley Milling Company is Pro-Lass. But it is not at all approximable to Sweet Lassy or to Lassy. Phonetically and visually they are dissimilar. And this court is unwilling to accord to the plaintiff even as against its actual competitors any absolute monopoly of the syllable Lass. There is no evidence of the actual registration or use of Lasso; and, even if there were, it is sharply divergent, in both sound and suggestive significance, from Lassy. Molasso is even more obviously distinguishable. Besides, though its registration is established, it is not shown whether, or how if at all, it has been used. Lassie, with an accompanying picture, has been registered by Federal Milling Company and its predecessor, but only for use in the branding of flour for human use. What employment of it has been made is not shown; but it satisfactorily appears that its application has not competed with the plaintiff in product, and probably not in territory.

■ The names themselves, Lassy and Sweet Lassy, are, in the court's view, subject to appropriation as Trade-Marks. The defendant does not appear to contend otherwise. And such a contention would not seem to be valid. Sweet alone could hardly be relied upon as a valid mark, because it is merely a descriptive adjective, and in the case of the plaintiff's Sweet Lassy products, especially the cattle supplement, is faithfully reflective of its taste induced by its distinguishing molasses ingredients. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73; Standard Paint Co. v. Trinidad Asphalt Mfg. Co., 220 220 U.S. 446, 31 S.Ct. 456, 55 L.Ed 536; William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161; Elgin National Watch Co. v. Illinois Watch Case Co., 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365; Richmond Remedies Co. v. Dr. Miles Medical Co., 8 Cir., 16 P.2d 598; Skinner Mfg. Co. v. Kellogg Sales Co., 8 Cir., 143 F.2d 895. But the word, Lassy, in its relation to stock feeds, is clearly fanciful, not descriptive. Its ordinary connotation suggests the personality of a young girl; and, as such, it is in no wise, naturally, and apart from purposeful and protracted use in trade, descriptive of any cattle feed or hog feed or dog feed. Nor, in the court's estimation is its availability as a mark destroyed or impaired by the association with it of the adjective Sweet.

■ And the plaintiff is not limited, for its protection, to its position that in the terms Sweet Lassy and Lassy it has valid technical Trade-Marks. For it is held that, though a name relied upon by a claimant cannot become a valid Trade-Mark, "nevertheless, when a person has adopted and for a long time used a word or words, descriptive or otherwise, as a trade-name until it has acquired a new or secondary meaning, viz. a designation of a particular product or business as belonging to that person,

the courts will protect him in his rights in relation to his trade-name" Richmond Remedies Co. v. Dr. Miles Medical Co., 8 Cir., 16 F.2d 598; Armstrong Paint & Varnish Works v. Nu-Enamel Corporation, 305 U.S. 315, 59 S.Ct. 191, 83 L.Ed. 195; Coca-Cola Co. v. Koke Co. of America, 254 U.S. 143, 41 S.Ct. 113, 65 L.Ed. 189; Elgin National Watch Company v. Illinois Watch Case Co., 179 U.S. 665, 21 S.Ct. 270, 45 L.Ed. 365; Charles Broadway Rouss, Inc., v. Winchester Co., 2 Cir., 300 F. 706. And within the territorial limits of its trade area, the court is led to conclude that the plaintiff has employed its terms in application to its products and with emphasis upon itself as their source, thus branded, so long, so diligently and so consistently that they have achieved thereby a secondary meaning, whereby they identify the plaintiff's stock feeds.

■ While federal authorities control the course of decision in the protection of the plaintiff's names as technical Trade-Marks, the law of the state of Nebraska in which this court sits governs insofar as the question of unfair competition with a product having a name with a secondary meaning is concerned. But this distinction is of no vital significance, because there is no substantial difference between Nebraska's law and the general law, and both parties rely principally upon federal authorities. (See observation of Judge Sanborn in Skinner Mfg. Co. v. Kellogg Sales Co., 8 Cir., 143 F.2d 895; the writer's detailed discussion of the matter in Skinner Mfg. Co. v. General Foods Co., D.C.Neb., 52 F.Supp. 432; and Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73.

■ The right of the owner of a technical Trade-Mark is actionably violated when a competitor, especially within the former's trade territory and in the designation of an identical or essentially similar product, either employs the identical name alone or in association with other language, or employs one so colorably imitative of it that its use is likely to mislead or deceive an ordinarily prudent purchaser in supposing that he is securing the product of the Trade-Mark owner. Proof of formal intent to confuse or of actual confusion is not required. Davids Co. v. Davids Manufacturing Co. 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046; Barton v. Rex-Oil Co., 3 Cir., 2 F.2d 402, 40 A.L.R. 424. And while in cases involving only unfair competition with goods not protected by a technical Trade-Mark, the purpose of "palming off" of one's goods as those of a competitor is emphasized, that purpose and the probability of its achievement are commonly inferable from the name appropriated and the manner of its use. And even in that field a formal intent to "palm off" one's goods is not the sole ground of equitable relief International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, 2 A.L.R. 293; Armstrong Paint & Varnish Co. v. Nu-Enamel Corporation, 305 U.S. 315, 59 S. Ct. 191, 83 L.Ed. 195.

The plaintiff's prayer for injunction against the defendant's employment of the word Lassy must be and is being denied, for the simple reason that the defendant has never applied it to any product. Its single advertisement published in three papers in which the word was mistakenly spelled in that manner does not nullify or impair that conclusion. Arguments by the plaintiff to the contrary are unrealistic and immature.

■ But the court is satisfied, and concludes as a matter of law that the defendant's use of the word Lassie in its names Lucky Lassie Lumpets and Summer Lassie was both violative of the plaintiff's rights as holder of its Trade-Marks and also an act of unfair competition in the field of the common law.

The facts upon the issue will be only partially recalled, not at all restated. The parties have largely common, though not identical, trade territories. They deal in large part with the same purchasing trade. Their soft pellet feeds are practically indistinguishable in form, content, and purpose. Their advertising methods are broadly alike. The defendant, as between it and the plaintiff is the newcomer, first in the general stock feed trade and especially in the preparation and sale of a soft pellet feed. In entering to the soft pellet

field the defendant knew of the plaintiff's business and its trade name, Sweet Lassy, though it had no knowledge of the registration of its Trade-Marks. It had a general knowledge of the favorable trade enjoyed by the plaintiff in their common territory. It chose to apply to its soft pellet feet the name Lucky Lassie Lumpets, and to a hard pellet product the name Summer Lassie, in both of which the distinguishing word is Lassie.

Now, Lassie and Lassy are, in reality, not merely similar terms but the same word, identical in conventional significance and in phonetic quality. In a generation which advertises extensively by radio spot announcements, the latter identity is especially serious; for one hearing either of the names could not know the manner of its spelling.

■ The court considers that, in the face of the plaintiff's Trade-Mark and long employment of the word Lassy, the word Lassie was simply unavailable to the defendant, and also that its use for the products to which it was applied and in the common trade area of the parties was naturally and necessarily calculated to mislead reasonably prudent purchasers of feeds into supposing they were getting the plaintiff's established and familiar product. The use of the words Lucky and Summer and of the descriptive noun Lumpets does not absolve the defendant from the fault of illicitly appropriating the word Lassy through the employment of its true counterpart Lassie. Neither does the defendant's emphasis of its identity as the maker and seller. While such emphasis is often a circumstance supporting innocence of piracy in the use of a name that is available, Skinner Mfg. Co. v. Kellogg Sales Co., 8 Cir., 143 F.2d 895, it cannot avail as justification for the appropriation of another's validly established name. Jacobs v. Beecham, 221 U.S. 263, 31 S.Ct. 555, 55 L.Ed. 729; Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713.

■ It is true that the defendant no longer uses the word Lassie in application to any of its products and that it discontinued such use a few weeks before the institution of this action. But in the circumstances of this case the actual abandonment of the word should not deter the court from entering an order injunctively preventing the defendant from employing the word hereafter. The court recognizes that an injunction operates prospectively and is aware that there is no present and continuous violation of the plaintiff's rights by the use of the word Lassie in its business. But the threat of its resumption is not, on that account, wholly eliminated. There was earlier and active employment of the term under a claim of right. While this litigation has witnessed no substantial attack upon the plaintiff's claim of the title to the exclusive use of its Trade-Marks, it may not be said that the defendant unequivocally admits that right. The strict legal necessity of its abandonment of the word Lassie, as distinguished from its disuse from considerations of prudence or fair dealing, is not formally conceded by the defendant. Some of the advertising material, in substantial quantity, publicising the defendant's products or at least one of them under names or a name including the word is still in existence and in its possession.

An injunctive order should, therefore, be granted establishing the plaintiff's title to and right to the exclusive use within its trade territory of its two names in application to its stock feeds, preventing the defendant from using, or resuming the use of, the word Lassie in application to competing products of its manufacture or sale and from the use in advertising of any of its advertising material prepared for advertising its products or any of them under names or a name including the word (without, however, directing the destruction of such material) and taxing the costs of the action to the defendant, but reserving for further hearing and determination the question of the plaintiff's right to recover damages and to have an accounting of profits.

■ But the court is equally convinced that the plaintiff's rights do not extend to

the interception by judicial decree of the defendant's use of the terms Lucky 'Lasses Lumpets and Summer 'Lasses, or either of them, in application to its products. In the case of the former term, the words Lucky and Lumpets, and in the case of the latter, Summer, do not even remotely come into collision with the plaintiff's Trade-Marks or either of them. Their use involves neither identity nor similarity of sound, nor direct significance nor remote implication of the plaintiff's names, or either of them. 'Lasses alone is involved.

Now, 'Lasses is neither identical with, nor equivalent or deceptively similar to Lassy. They do, indeed, have the same initial syllable. But the plaintiff has no absolute monopoly on the employment of that syllable in the designation of any commercial products. Its right is limited to protection against its use either alone or as a component part of a word or phrase employed confusingly or deceptively in the designation and marketing of another's competing product.

In its sound, 'Lasses (of course, with no reference to the prefixed apostrophe) is distinguishingly different from Lassy. Their separate pronunciations, divorced from written form, make sharply divergent sounds. The short "i" sound of the single vowel ultimate syllable of the plaintiff's word bears no resemblance to the sound of the final syllable of the defendant's word with its slurred "e" followed by the hard "s" or "z". In written or printed appearance they are also unlike, whether the apostrophe be used or not in writing Lasses.

In significance also, the words are sharply different. The normal meaning of Lassy has already been set out. Lasses has a familiar and clearly defined meaning. It is a colloquial, or dialectic, form of the word "molasses". Around it many stories have been built and several popular songs have been written. Examples need not be noted here, but will readily occur to counsel. The employment of the apostrophe resulting in 'Lasses serves principally as emphasis of the inevitable significance of the term.

Besides, 'Lasses, in its normal significance, is clearly descriptive of the characterizing and dominant ingredient of the defendant's feeds. That ingredient is not the major item by weight of the products, for by stipulation it must be found to be somewhat lower than fifty per cent of the mass of soft pellets and not more than twelve per cent of hard pellets by weight. It is a substantially smaller fraction of the whole in each instance, judged by volume. But it is the one element of the product by which its character is described. Witnesses for both parties referred to such feeds as "molasses feeds" or "molasses products". And when used in application to stock feeds, or feeding supplements, in the form of Lucky 'Lasses Lumpets or Summer 'Lasses it gives to the products identified the significance of stock feeds with a high molasses content. It may be suggested, in fact, that the same reasoning on the score of its descriptive quality which emphasizes the defendant's right to use the word may operate to prevent the defendant from acquiring any property right in its use. But that question is not before the court and need not be, and is not, decided.

In the court's opinion, therefore, the word 'Lasses was an allowable term for application to the plaintiff's products in their introduction upon the market, provided, of course, it was not used in such manner as to make the defendant's selling deceptive. And, all the facts being considered, the court is satisfied that no such deception has been practiced. The dissimilarity between the packaging of the plaintiff and that of the defendant has been mentioned, as has the defendant's emphasis of its own name and address as the origin of its product. These circumstances, inadequate to justify its improper use of the plaintiff's principal brand name or the exact equivalent of it, are considerations pointing to fairness in its employment of a permissible name. Then, too, the defendant has been free from any actual practices in the marketing of its products under the name 'Lasses which have been designed, or by their very nature are likely, to be deceptive and misleading to an or-

dinary purchaser. At this point the court is fully mindful of the correspondence between the defendant and its advertising agency, and also of its initial adoption of the plaintiff's name Lassy in the form of Lassie. Those circumstances may be, and have been, considered by the court adversely to the defendant in its entire operation in the introduction and sale of its products under the several names which have been discussed. But they are regarded as inadequate, by way of continuing punishment, to despoil the plaintiff of the right to employ a name in its business that is otherwise available to it.

So, the court's judgment will deny to the plaintiff any injunctive relief against the defendant's use in its trade of Lucky 'Lasses Lumpets and Summer 'Lasses, or either of them.

Counsel for the plaintiff will promptly prepare and submit to counsel for the defendant a form of judgment in accordance with this announcement, to be effective not as of the date of this memorandum, but as of the date of filing of the judgment. Upon approval by counsel for the defendant, the form of judgment shall be presented for entry and filing. In default of such approval the form with the objections thereto shall be submitted to the court for settlement, and, as settled, for entry and filing.